## HARRIS & CO. v. CHIPMAN.

### CHIPMAN v. HARRIS & CO.

(Circuit Court of Appeals, Eighth Circuit. October 19, 1907.)

Nos. 2,343, 2,344.

1. BANKS AND BANKING—WRONGFUL DEPOSIT BY AGENT—LIABILITY OF BANK TO PRINCIPAL.

    A banker, who knowingly permitted an agent to deposit money of his principal to his own account and mingle the same with his own funds in violation of his contract, which required the deposit to be in the name of his principal, if for that reason chargeable with liability to the principal, in the absence of fraud or conspiracy, is accountable only for losses resulting directly from such wrongful deposit, such as for sums applied by the agent to his own use, and not for losses resulting from the use of the money by the agent as contemplated by the contract of agency.

2. SAME—ACCOUNTING.

    In such case the banker cannot be held to account for a sum originally advanced by the principal to the agent to be used for the purposes of the agency, and so deposited by the agent to his own credit, but which was afterwards treated by the principal as a loan to the agent, and for which his note was taken, nor for a sum lent by the banker to the agent personally, and which, having been used for agency purposes, was repaid by the principal with knowledge of the facts.

3. EVIDENCE—ADMISSIONS IN PLEADING.

    Where plaintiff sued defendant, a banker, for losses sustained through an agent, on the ground that defendant knowingly permitted the agent

156 F.—59

to deposit money advanced to him by plaintiff to his own credit in violation of his contract, an allegation in the answer that plaintiff had previously sued the agent for such losses and recovered judgment for a much smaller sum than that demanded from defendant was not an admission by defendant of his liability for the amount of such judgment, to which he was not a party.

Appeals from the Circuit Court of the United States for the District of Utah.

Ralph W. Breckenridge and Charles J. Greene (Andrew L. Hoppaugh, on the brief), for plaintiff.

Waldemar Van Cott (George Sutherland and E. M. Allison, Jr., on the brief), for defendant.

Before SANBORN, HOOK, and ADAMS, Circuit Judges.

HOOK, Circuit Judge. Harris & Co., incorporated, sued James Chipman to compel him to account for $75,967 as a trustee ex maleficio, and secured a decree for $2,368.45 and some accrued interest. Both parties appealed. Harris & Co. was engaged in the live stock business, with main offices at South Omaha, Neb. James Chipman was a banker, and lived in Utah. The controversy arose out of the operations of John F. and Richard W. Bradshaw, who were engaged in buying and selling live stock in Utah and neighboring states under the firm name of Bradshaw Bros. Harris & Co. employed the Bradshaws as agents to purchase sheep and cattle for it and with its funds, and intrusted to them from time to time upwards of $150,000, of which $75,967 went into Chipman's bank to the credit of "Bradshaw Bros." Harris & Co. sustained losses and sought to recover of Chipman upon three grounds: (1) That Chipman and the Bradshaws conspired to defraud Harris & Co. of its moneys, and its loss was the result of the conspiracy. (2) That before employing the Bradshaws, Harris & Co. sought of Chipman information regarding their financial responsibility, and that Chipman intentionally gave them a false standing. (3) That the contract between the Bradshaws and Harris & Co. required the former to keep the moneys advanced as the moneys of Harris & Co. and in its name in bank, and that the stock purchased should be purchased in the name of Harris & Co.; that Chipman knew this, but that nevertheless he allowed the Bradshaws to deposit the moneys received from Harris & Co. to the credit of their own account in his bank, to intermingle them with their own funds, and to check indiscriminately upon the account for their own expenditures and business operations, as well as for those in which Harris & Co. was interested. This, it is claimed, was equivalent to a conversion by Chipman of $75,967 of the funds of Harris & Co.

It will serve no useful purpose to give in detail the evidence appearing in the voluminous record touching the first and second of the grounds enumerated. In our opinion they were wholly unsubstantiated. There is no evidence from which it can fairly be inferred that Chipman and the Bradshaws engaged in any conspiracy to defraud Harris & Co. of its money or property. An analysis of the Bradshaw Bros.' account in Chipman's bank, whereby the credit items coming from Harris & Co. are segregated from those in which it had

no interest, and whereby the disposition of them is accurately traced, disproves all claim that the bank dishonestly profited by the admixture of the funds; and, as full opportunity to so profit presented itself and was not availed of, it is highly improbable that a purpose to do so was ever entertained. Neither does the evidence justify the assertion that the recommendation given by Chipman as to the Bradshaws' responsibility was not in good faith. Their previous dealings were sufficient to justify it, and a continued extension of credit by Chipman to the Bradshaws personally is persuasive evidence of his sincerity. That the Bradshaws were indebted to Chipman at the time is without material significance, in view of the fact that there was stock on hand, undisposed of, representing unclosed transactions between them.

The third ground upon which recovery is sought requires a more extended statement of our conclusions. As already observed, $75,967 belonging to Harris & Co., instead of being kept separately in its name, went to the credit of Bradshaw Bros. and became mixed with funds of that firm in Chipman's bank. The trial court in reaching its decree charged Chipman with that entire amount and credited him with the sums actually drawn out and used by the Bradshaws in paying for sheep and cattle purchased for Harris & Co., and also with two other items debited to the account before Chipman learned of the contract restriction upon the keeping of the funds. The accounting on this basis resulted in the balance of $2,368.45 specified in the decree. The decree proceeded upon the theory that Chipman became a participant in a misapplication of the funds from the time he became aware of the contract. We may here observe that the court credited Chipman with no disbursement on account of sheep or cattle purchases which the evidence did not show was made. Harris & Co. now contend that Chipman should not be credited with sums withdrawn and actually applied to purchases on its account, but only with the net results of each particular transaction. In other words, they say in substance that, if any resale by Harris & Co. of stock purchased resulted in a loss to it, that loss should have been charged to Chipman. Of course, this contention is inadmissible in view of what we have said concerning the freedom of Chipman from the imputation of fraud and conspiracy. If the fact were that all of the money intrusted to the Bradshaws under the contract had been actually used for the purposes of the contract, the mere deposit to the wrong account would have resulted in no damage. If the moneys were checked out of the bank and used for a proper purpose, Chipman could not be held responsible for errors of business judgment of Harris & Co. or its agents, nor for losses sustained by subsequent improper conduct of the latter. Such losses have no proximate connection with the keeping of the funds in the wrong account. Also, if part of the moneys went out of the bank to the personal use of the Bradshaws, the recovery could not be for more than the amount so misapplied.

Assuming that the theory adopted by the trial court was right, generally speaking, there were three items charged to Chipman which in our opinion should have been eliminated from the accounting. For some time prior to June 26, 1899, Harris & Co. and the Bradshaws

had extensive transactions in cattle, some of which were cleared through Chipman's bank. On the day mentioned the contract was entered into whereby the character of their relations was changed, and the Bradshaws agreed to act as agents and to handle the moneys advanced them as the moneys of their employer. The Bradshaws and Chipman had also had extensive dealings in sheep and cattle, and the former maintained a personal account in the bank of the latter. On July 6, 1899, Bradshaw Bros. drew a draft upon Harris & Co. for $5,000, deposited it with Chipman, and received credit for the amount in their personal account. On July 10th a similar transaction occurred. These drafts were for the first moneys advanced by Harris & Co. under the contract; but when Chipman credited them to the Bradshaw Bros. account he was not aware of the limitation imposed upon their authority. Counsel for Chipman say in this state of affairs that he had no power to compel the Bradshaws to open a new account in the name of Harris & Co. and to transfer the items in question to its credit, that the relation of banker and customer gave him no authority to do so without their assent, that under the circumstances it was not his duty to exercise a supervisory control over their disposition of the funds in their personal account, and, had he attempted to do so, they had the right to close their account and transfer their business elsewhere (Mr. Justice White in Randolph v. Allen, 19 C. C. A. 353, 73 Fed. 23). We need not consider whether the doctrine of the case cited applies to the facts before us, for we are clearly of the opinion that the character of the transaction, so far as it relates to the two drafts, was subsequently changed by mutual agreement from that of an advancement under the contract to that of a time loan. Some differences which arose between the parties to the contract as to the right construction of it were adjusted at Omaha, Neb., between the 21st and 25th of July, 1899. Prior to July 22d, the Bradshaws stood charged upon the books of Harris & Co. with the two $5,000 drafts. On that day they gave Harris & Co. a 90-day note for $10,000, bearing 10 per cent. interest and dated July 8th, which was the average of the dates of the two drafts. It was credited to the Bradshaws, and in effect eliminated the drafts from the account. On August 10, 1899, Harris & Co. rendered to the Bradshaws a statement of their dealings to that date. It showed the note to the credit of the Bradshaws, and also that there was a balance of $766.29 due them. A few days later Harris & Co. paid this balance, though the note unmatured was still outstanding. Under these circumstances the moneys represented by the two drafts should not have been treated at the accounting as the moneys of Harris & Co. wrongfully converted by the Bradshaws with Chipman's participation.

As to the other item: About the middle of July, 1899, J. F. Bradshaw was in Idaho buying sheep for Harris & Co. He had made some purchases, and in doing so had checked on the firm account with Chipman for about $7,000. He was about to make another purchase, which called for nearly $20,000. Some telegraphic correspondence then ensued between Bradshaw and Harris & Co. The latter demanded that the bill of lading of the sheep should be attached to the draft for the purchase price. Bradshaw contended this was not ac-

cording to the contract. The seller of the sheep refused to take such a draft. Thereupon Bradshaw, after advising Harris & Co. that he would have to procure the money elsewhere, wired to Chipman and procured a credit of $20,000 and completed the purchase. The sheep came to $18,275.70. They were shipped by the Bradshaws as their own sheep to Nebraska, where they were taken off of their hands by Harris & Co., who authorized a draft upon them for $20,000 to repay Chipman. The claim that this draft should be charged to Chipman in the accounting between him and Harris & Co. as for moneys misappropriated is foreclosed by the admission of the president of the latter that it was to repay Chipman and that he did not think that the proceeds of it went to the credit of any account of Harris & Co. in Chipman's bank.

It was claimed by the Bradshaws that the provision of the contract that the moneys furnished by Harris & Co. should be kept in an account in its name had been abrogated. Chipman was so informed by one of the Bradshaws, and we think he was warranted in believing so in view of a letter of date July 25, 1899, sent by Harris & Co. to Chipman's bank, the fact that it was arranged that thereafter an agent of Harris & Co. should accompany the Bradshaws and be present at the receiving and payment for stock purchased, and the further fact that at no time thereafter, as long as the relations between the Bradshaws and Harris & Co. continued, did the latter ever ask for or receive from Chipman a statement of any account in his bank in which its moneys were deposited. There is the further fact that Harris & Co. knew that about half of the moneys advanced to the Bradshaws did not go through Chipman's bank. These considerations apply to those items placed to the credit of Bradshaw Bros.' account after the date of the letter above referred to. But if the two drafts for $5,000 each and the one for $20,000, with the corresponding disbursements from the proceeds, are eliminated from the accounting, as we think they should be, nothing would be left for recovery.

Before answering, Chipman interposed a plea in bar, wherein he claimed that Harris & Co., being a Nebraska corporation, was not authorized to do business in Utah, because it had not complied with the laws of the latter state. Issue was taken, and upon a trial the plea was falsified. It is now contended by counsel that the trial court should not have allowed Chipman to answer, but should at once have entered a decree for Harris & Co. As to this we need say no more than that the action of the trial court was not challenged in the assignment of errors, as required by the rules.

In answer to the charge in the bill that Harris & Co. had lost $75,000 by the Bradshaws' acts and Chipman's participation, the latter averred that Harris & Co. had previously sued the Bradshaws for what they owed it, and had recovered judgment for $25,446.64, and, further, that no other sum was due from the Bradshaws, and that the judgment was for the same moneys that Chipman was then being sued for. Counsel claim that this was an admission of an indebtedness, conclusive upon Chipman, and that Harris & Co. were entitled to a decree accordingly. But Chipman was not a party to that action, and was not bound by the judgment. The averments in the answer were

by way of evidence that Harris & Co. was consciously overstating its claim. Moreover, if it were true that the losses of that company were of moneys that went through Chipman's bank, it would not follow that Chipman was responsible for them. Under the contract the Bradshaws guaranteed the financial success of the ventures in which the moneys of Harris & Co. were invested; but, as we have seen, the liability of Chipman stands upon a narrower ground. The Bradshaws' liability for the outcome of the moneys that went through the bank of Chipman and the latter's right conduct and good faith are not inconsistent.

The decree of the Circuit Court is reversed, with direction to enter a decree dismissing the bill upon the merits