## MARTIN v. FIRST NAT. BANK OF RUSH CITY.

### No. 2045.

District Court, D. Minnesota, Third Division.
Aug. 10, 1931.

R. C. Andrews, of Minneapolis, Minn., for plaintiff.

S. B. Wennerberg, of Center City, Minn., and George H. Sullivan, of Stillwater, Minn., for defendant.

NORDBYE, District Judge.

The above-entitled matter came on ·for trial before the undersigned, one of the judges of the above-named court, without a jury, at Duluth, Minn., on the 7th day of May, 1931; R. C. Andrews of Lindstrom, Minn., appearing in behalf of the plaintiff, and S. B. Wennerberg, Center City, Minn., and George H. Sullivan, Stillwater, Minn., appearing in behalf of the defendant. The court having heard the evidence adduced at said trial, and upon all the files and records herein and the arguments and briefs submitted to said court, makes the following findings of fact and conclusions of law.

Findings of Fact.

I. That Peter J. Engberg, above named, is the duly appointed, qualified, and acting guardian of the estate of Ernest L. Martin, incompetent, and that letters of guardianship upon said estate were duly issued to him on January 25, 1928, by the probate court in and for the county of Chisago and state of Minnesota.

II. That defendant, the First National Bank of Rush City, a corporation (hereinafter called the Bank), is a national banking association under the laws of the United States of America.

III. That plaintiff, Ernest L. Martin, was duly adjudged incompetent by said probate court of Chisago county on December 9, 1919, and was duly committed to the State Hospital for the Insane at Rochester in said state, and was later transferred to the United States Hospital for Disabled Veterans at St. Cloud, Minn., where he is now in confinement.

IV. That thereafter, and on the 7th day of April, 1920, one G. M. Ericson was appointed special guardian of the estate of said Ernest L. Martin, incompetent, by the probate court aforesaid, and during all the times hereinafter mentioned, and until January 4, 1928, said G. M. Ericson having qualified as such guardian continued to act as such, and to have custody and possession of the estate, property, and money of said incompetent, and at the time of his appointment as special guardian of plaintiff's estate, said G. M. Ericson was a stockholder and director, and the cashier of said defendant Bank, and was later made a vice president of said Bank, and during all of the time that said G. M. Ericson was acting as special guardian of plaintiff's estate, and in possession of the same and plaintiff's property and money, said G. M. Ericson was the principal managing officer of defendant Bank, and was directly and solely in charge of the affairs and daily business of said Bank.

V. That subsequent to his appointment as such special guardian, the said Ericson opened an account with said Bank for the deposit therein of plaintiff's money and credits, his account being known and designated on the records of said Bank as an account with "Estate of Ernest L. Martin, Incompetent." That of the money and credits coming into the hands of Ericson in his capacity as special guardian of plaintiff's estate, being the property of plaintiff, the sum of $7,843.64 was paid by the government of the United States to plaintiff on account of a compensable injury suffered by him while in the army and service of the United States, and the sum of $4,600 was paid by the government of the United States to plaintiff on account of his policy of insurance with said government. That all of the payments made to plaintiff by the government· of the United States and coming into the hands of said Ericson as special guardian were made by check drawn on the Treasurer of the United States and deposited by the said Ericson in said Bank and credited to said trust account hereinbefore mentioned.

VI. That said Bank had actual knowledge that all of the funds coming into the hands of Ericson as special guardian of plaintiff's estate, and the deposits to the credit of plaintiff's said account, were held in trust for plaintiff and that the said Ericson as special guardian had no authority to withdraw any part of the deposit to plaintiff's credit except in the ·ordinary and usual manner of withdrawing funds from accounts in a depository bank and only for such purposes as were au··

thorized by law and the purposes of said guardianship.

VII. That the St. Croix Valley Land & Loan Company (hereinafter referred to as the Land Company) is a corporation organized and existing under the laws of the state of Minnesota, and that during all the times herein mentioned, the said G. M. Ericson was stockholder and director of said Land Company and its principal manager and executive officer. That the said Land Company was also a depositor of said Bank and carried a checking account therein to which deposits were credited from time to time in favor of said Land Company.

VIII. That said G. M. Ericson was also a depositor in said Bank in his individual capacity and carried a checking account therein during all the times herein mentioned.

IX. That both Ericson and the Land Company during the times herein mentioned were in financial straits, and during this period Ericson habitually made overdrafts on his checking account. Such overdrafts were customarily permitted by said Bank, and the Bank customarily and regularly made loans by way of overdrafts to said Ericson without objection by the other officers or directors of said Bank.

X. That on May 10, 1921, less than a year after said Ericson became custodian of the fund belonging to plaintiff, he drew out of said fund the sum of $1,200 by way of a debit slip on said account, and credited $400 thereof to his own personal account and $800 to the account of the Land Company. That on February 4, 1922, Ericson's personal account was overdrawn in the sum of $597.66, and on said date the said Ericson drew by debit slip from plaintiff's account the sum of $700 and by credit slip credited to his personal account the sum so drawn in order to cover the overdraft that existed there. That on March 24, 1923, an overdraft of $1,005.24 existed in Ericson's personal account, and on said date he drew by debit slip on plaintiff's account the sum of $500, and of the sum so withdrawn, the sum of $388.34 was credited to Ericson's personal account to apply on the overdraft that existed there. On August 11, 1923, $500 was withdrawn from the plaintiff's account; $381.71 of the amount so withdrawn was applied on an overdraft that existed in Ericson's account in the sum of $381.71. On August 16, 1923, there was an overdraft in the account of the Land Company in the sum of $54.63, and said Ericson caused a debit slip to be drawn on plaintiff's account in the sum of $1,500 and by credit slip credited the Land Company's account in the amount so drawn. Thereafter a large number of withdrawals were made by Ericson from the plaintiff's account and deposited in his personal account to cover his overdrafts or to increase the funds in his own personal account. A considerable number of withdrawals and deposits were made by debit and credit slips, but the use of debit slips in connection with withdrawals from plaintiff's account was not limited to misappropriation of the funds in the estate. Many legitimate claims against this estate were paid by this method; that is, Ericson would draw a debit slip against the estate funds and pay a legitimate bill with cash of the Bank and thereafter credit the cash account with the amount debited against plaintiff's account.

XI. That in the latter part of 1925, the Land Company was in dire financial circumstances and had no funds with which to pay checks drawn on its account in the defendant Bank. That for some period of time in the years 1925 and 1926, checks of the Land Company aggregating $418 drawn on the defendant Bank were carried as cash items by the bookkeeper at the suggestion of said Ericson, and then on March 2, 1926, with the intent on his part and on the part of the Land Company to misappropriate the same, Ericson ordered the bookkeeper to charge these checks to the account of the plaintiff herein and thereafter such charge was accordingly made.

XII. That between May 10, 1921, and May 29, 1926, with the intent to misappropriate the same for his use and for the purpose of paying indebtedness due the Bank by way of overdrafts, the said Ericson withdrew the sum of $7,775 from plaintiff's account. That $5,475 of said sum was credited to Ericson's personal account and $2,300 was credited to the account of the Land Company. That $2,928.28 of said sum so withdrawn was applied in payment of overdrafts due the defendant Bank from Ericson and the Land Company, and of the said sum of $7,775 so withdrawn, the sum of $6,575 was deposited to the credit of Ericson's personal account and to the credit of the Land Company subsequent to and including February 4, 1922, when the first application of trust funds was made to the payment of overdrafts.

That attached to and made a part of these findings of fact, with the same force and effect as if set forth in full herein, is a state-

ment referred to during the trial as "Plaintiff's Exhibit G," [1] which sets forth the dates and amounts and the application of the various withdrawals made by the said Ericson between May 10, 1921, and May 29, 1926.

XIII. That the said Ericson had no authority as guardian to withdraw any sum from plaintiff's said account except for purposes permitted by law and for the ordinary and usual purposes of his trust. That all of said withdrawals were made by said Ericson while acting as the sole and exclusive officer in charge of defendant Bank and the sole and only officer or agent of the defendant having any knowledge thereof. That all of the said withdrawals and unauthorized debits were wrongful and unlawful diversions and misappropriations of trust funds belonging to plaintiff, and in repaying to the Bank the overdrafts hereinbefore mentioned, Ericson acted as the agent for the defendant Bank and within the scope and course of his employment with said Bank, and the knowledge of said Ericson as said agent is imputed to the said Bank.

XIV. That the defendant Bank knew that the money deposited to plaintiff's credit constituted a trust fund for plaintiff, and defendant Bank knew on February 4, 1922, by and through its agent, Ericson, that the funds of plaintiff were being diverted for the purpose of satisfying indebtedness to the Bank by way of overdrafts, and the Bank knowingly received trust funds on that date for unlawful purposes. That notwithstanding the breach of trust committed by its agent and the knowledge thereof by the Bank on said date, the said Bank permitted said Ericson to remain in full charge of said Bank and to remain as custodian of said trust funds, and thereafter received from the said trust funds the sum of $2,330.62 to apply on indebtedness due it from the said Ericson and the said Land Company.

XV. That during all the times herein mentioned, the said Ericson was financially embarrassed and frequently overdrew his account with the Bank, all of which was known to the Bank, and on several occasions during this period, the bank examiners in the course of their duty criticized the frequent overdrafts of said Ericson and admonished the Bank to remedy this situation.

XVI. That by the exercise of reasonable care and diligence the Bank knew or should have known on February 4, 1922, that the said Ericson intended to misappropriate plaintiff's funds and convert the same to his own use and the use of the Land Company, but instead of taking reasonable measures to prevent further misuse of the trust funds intrusted to its care, the said Bank became a participant in the misappropriation and profited thereby, and aided and assisted said Ericson in carrying out his scheme for the use of trust funds for unlawful purposes.

[1] Plaintiff's Exhibit G

| Date of Withdrawal from Plaintiff's Account | Amount Withdrawn from Plaintiff's Account | Amount Credited to Ericson's Account | Amount Credited to Acct. of Land Co. | Overdraft in Ericson's Account | Overdraft in Acct. of Land Co. | Total Amount Applied in Pmt. of Overdrafts | Total Amt. Deposited in connection with O'drft | Total Amount Deps'd to both accounts since date of first withdrawal & application of Overdraft |
|---|---|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| May 10—21 | $1,200 00 | $ 400 00 | $ 800 00 | — | — | — | — | — |
| Feb. 4—22 | 700 00 | 700 00 | — | $ 597 66 | — | $ 597 66 | $ 700 00 | $ 700 00 |
| Mar. 24—23 | 500 00 | 500 00 | — | 1,005 24 | — | 388 34 | 500 00 | 500 00 |
| Aug. 11—23 | 500 00 | 500 00 | — | 381 71 | — | 381 71 | 500 00 | 500 00 |
| Aug. 16—23 | 1,500 00 | — | 1,500 00 | — | 54 63 | 54 63 | 1,500 00 | 1,500 00 |
| Sept. 29—23 | 500 00 | 500 00 | — | 129 98 | — | 129 98 | 500 00 | 500 00 |
| Dec. 8—23 | 700 00 | 700 00 | — | 508 37 | — | 508 37 | 700 00 | 700 00 |
| Mar. 19—24 | 100 00 | 100 00 | — | 55 16 | — | 55 16 | 100 00 | 100 00 |
| Apr. 14—24 | 100 00 | 100 00 | — | — | — | — | — | 100 00 |
| May 21—24 | 150 00 | 150 00 | — | 147 76 | — | 147 76 | 150 00 | 150 00 |
| Sept. 23—24 | 300 00 | 300 00 | — | 586 73 | — | 153 23 | 300 00 | 300 00 |
| Nov. 19—24 | 300 00 | 300 00 | — | 168 48 | — | 168 48 | 300 00 | 300 00 |
| Jan. 12—25 | 200 00 | 200 00 | — | 257 64 | — | 105 03 | 200 00 | 200 00 |
| May 4—25 | 250 00 | 250 00 | — | 152 60 | — | 152 60 | 250 00 | 250 00 |
| Nov. 13—25 | 200 00 | 200 00 | — | 85 33 | — | 85 33 | 200 00 | 200 00 |
| Jan. 4—26 | 300 00 | 300 00 | — | — | — | — | — | 300 00 |
| May 29—26 | 275 00 | 275 00 | — | — | — | — | — | 275 00 |
|  | $7,775 00 | $5,475 00 | $2,300 00 | — | — | $2,928 28 | $5,900 00 | $6,575 00 |

XVII. That the said Ericson and the Land Company are now and for a long time have been insolvent, and no part of the funds so embezzled by the said Ericson, as hereinbefore stated, has been returned to or received by the plaintiff. That the defendant Bank became insolvent on June 4, 1927, and on said date the Comptroller of the Currency appointed a receiver of said Bank and ever since that time has been and now is in receivership.

XVIII. That plaintiff never filed any claim with the receiver before the commencement of this suit, but defendant at no time recognized the validity of plaintiff's claim, and any demand or presentation of a formal claim to the defendant or its receiver would have been an idle procedure.

XIX. That on account of the facts hereinbefore stated, the defendant is liable to the plaintiff for the sum of $6,575, which was misappropriated by the said Ericson on and after February 4, 1922, and is liable in the further sum of $418, which represents the amount of the Land Company checks which were wrongfully debited to plaintiff's account by the said Ericson.

### Conclusions of Law.

1. That the court has jurisdiction of the parties to the suit and the subject-matter thereof.

2. That plaintiff have judgment against defendant in the sum of $6,993, with interest on the sum of $418 from March 2, 1926, at the rate of 6 per cent. per annum, and on the sum of $6,575 at the rate of 6 per cent. per annum from the date of the misappropriation of the various withdrawals, as follows:

Interest on $700 from February 4, 1922.
Interest on $500 from March 24, 1923.
Interest on $500 from August 11, 1923.
Interest on $1,500 from August 16, 1923.
Interest on $500 from September 29, 1923.
Interest on $700 from December 8, 1923.
Interest on $100 from March 19, 1924.
Interest on $100 from April 14, 1924.
Interest on $150 from May 21, 1924.
Interest on $300 from September 23, 1924.
Interest on $300 from November 19, 1924.
Interest on $200 from January 12, 1925.
Interest on $250 from May 4, 1925.
Interest on $200 from November 13, 1925.
Interest on $300 from January 4, 1926.
Interest on $275 from May 29, 1926.

—together with his costs and disbursements herein.

Let judgment be entered accordingly.

### Memorandum.

There can be no serious contention that the Bank is not liable for the actual amounts it received from plaintiff's account in the repayment of the overdrafts in Ericson's and the Land Company's accounts. Ericson, its cashier, of course knew that trust funds were being used to pay an indebtedness due the Bank by way of overdrafts. The Bank, through its cashier, knowingly permitted trust funds to be diverted and used in paying debts occasioned by overdrafts. It must be required to restore to the trust fund the amounts that it received in this manner.

It is my opinion, however, that not only is the Bank liable for the actual sums it received in repayment of these overdrafts, but in addition is responsible to plaintiff for all moneys diverted and misappropriated by Ericson on and after February 4, 1922, which is the date that the first overdraft was paid with trust funds. This date marks the time when the Bank became aware of the perfidy of its cashier and it became in possession of information as to his breach of trust which required it to protect its incompetent depositor from further loss.

The Bank knew that plaintiff's account consisted of trust funds. This account was carried as the "Estate of Ernest L. Martin" for nearly six years. The character of this account and the way in which it was carried gave to the Bank sufficient notice to indicate that these funds did not belong to Ericson. The Bank knew, or should have known, that the funds in the hands of a guardian are in his custody in trust and that such funds must be used in the ordinary and usual course of the administration of the estate and in furtherance of its object. Allen v. Puritan Trust Co., 211 Mass. 409, 97 N. E. 916, 919, L. R. A. 1915C, 518; Sternberg v. Blaine, 179 Ark. 448, 17 S.W.(2d) 286; Rodgers v. Bankers Nat. Bank (1930) 179 Minn. 197, 229 N. W. 90.

Volume 3 Minn. Dunnell's Digest, 419, Guardian and Ward Section, 4107 F: "Interest of guardian in property of ward—A guardian has no title or personal interest in the property of his ward, but only a naked authority not coupled with an interest. The legal as well as the beneficial title to both real and personal property remains in the ward. The guardian has a right to the possession of both forms of property, but only for the purpose of his trust and for the use and benefit of the ward. His possession is the possession of the ward. He holds the possession merely as the officer of the court

appointing him and subject to its orders in relation thereto."

It is well settled that a guardian has no authority to make a loan to himself. Sowers v. Pollock (1923) 112 Kan. 599, 212 P. 103, 30 A. L. R. 458 and note; In re Bates' Guardianship (1918) 70 Okl. 321, 174 P. 743; Fidelity & Deposit Co. v. Freud (1911) 115 Md. 29, 80 A. 603.

Unquestionably Ericson had a perfect right to maintain an account with the Bank as guardian even though he was sole manager and executive officer of the Bank. In disbursing the funds of the estate he would act as representative of himself and not of the Bank. When an officer of a bank deals with the bank on his own account, the knowledge of the officer is not generally imputed to the bank.

The Bank had a right to rely on the presumption that as a fiduciary Ericson would act lawfully and within the scope of his authority. A banking institution should not be required to supervise and scrutinize the various withdrawals made by a depositor that has an account in a trust capacity. The exigencies of modern banking business would justify no other rule. But a bank is not without responsibility to its depositors. It cannot become a party to a breach of trust, nor countenance a diversion of trust funds by lending its facilities to the aid thereof. It cannot sit by supinely after it has received notice that its depositor is misappropriating the funds of the beneficiary, or permit or acquiesce in the embezzlement of funds that to its knowledge belong to a trust estate.

The defendant's position is that Ericson was engaged in a personal scheme to defraud; that the other bank officials were innocent of any wrongdoing and had no personal knowledge of his breach of trust. Defendant earnestly contends that the knowledge of its cashier cannot be imputed to it and cites the generally recognized rule: "That knowledge of an agent, actually concealed from his principal, while the agent is dealing with the principal on his own account, is not to be imputed to the principal, even though the agent, assuming to act as such, did whatever was done on the part of the principal in the transaction with himself, if disclosure of the matter concealed would have had a tendency to defeat his purposes." Bank of Overton v. Thompson (C. C. A.) 118 F. 798, 801. The principle contended for by the defendant is not applicable to the facts of this case. On February 4, 1922, Ericson, within the scope of his authority as the sole manager and executive officer and the only official representing the Bank in the transaction, accepted and retained trust funds to pay indebtedness due the Bank by the way of an overdraft. Thereby the act of Ericson became the act of the Bank and the knowledge of Ericson became the knowledge of the Bank.

The Bank was apparently a one man institution. The directors left the entire management of the Bank to Ericson. They paid very little attention to its affairs and evidently permitted Ericson to carry on his scheme to defraud for a period of four years without any other official being personally cognizant of his duplicity. The use of debit and credit slips by Ericson in disbursing funds on this account is indicative of his control. The directors, however, had received direct information that Ericson was in financial straits, and that he was frequently overdrawn in his account. Ericson's conduct in this regard must have been quite flagrant to cause the bank examiners in their several reports to refer to his habit of overdrawing his account. It would seem that any reasonable supervision on the part of the officials of the Bank would have disclosed the misuse of trust funds. The other employees of the Bank were evidently dominated by Ericson and knowingly assisted him in the diversion of trust funds. It was the bookkeeper on Ericson's order that made the various bank entries regarding the transfer of trust funds and the charge of $418 of Land Company's checks to plaintiff's account.

The Bank was put on its guard when this account was opened. It knew that Ericson was not the owner of these funds. A guardian does not have title to his ward's funds. He is merely the custodian thereof. Notwithstanding this knowledge and its duty to its depositor, the plaintiff herein, the Bank placed Ericson in complete charge of the banking institution and permitted him to be the only bank official that was connected with the handling of this trust account for a period of four years.

Overdrafts as a practical matter are loans from a bank to a depositor. The loans of Ericson and the Land Company were repaid with trust funds. The Bank received and retained the benefits of Ericson's acts in taking care of the various overdrafts and cannot now be heard to say that it accepts the acts of its cashier in part but not in their entirety. If it accepts the advantages of the acts, it also must accept the disadvantages. It was neither Ericson, the guardian, nor Ericson, the individual, that acted on Febru-

ary 4, 1922, when the overdraft of $597.65 was repaid to the Bank by the use of a debit slip of $700 on plaintiff's account. It was neither Ericson, the individual, nor Ericson, the guardian, that provided for the payment of $418 of Land Company's checks with the funds of the plaintiff. The act of Ericson in applying trust funds to the payment of overdrafts was the act of Ericson, the cashier. It thereby became the act of the Bank, and the Bank thereby received actual knowledge and positive information of the breach of the trust. Instead of taking steps to protect the funds intrusted to its care, it became a privy to the defalcation. It participated in the fruits of Ericson's peculations and permitted him to remain in full charge of its banking institution. It will be presumed to have known that debit slips were being used by its cashier to divert trust funds through unauthorized channels. The act of Ericson in proceeding to transfer trust funds by way of debit and credit slips was scarcely the act of an ordinary depositor that had custody of trust funds. The Bank permitted Ericson to continue as cashier notwithstanding its attention had been called by the bank examiners to the frequent overdrafts and when it knew that such overdrafts were being paid with trust funds. It permitted Ericson to withdraw some $6,575 from plaintiff's account over a period of four years, and of that sum nearly $3,000 was actually received and retained by the Bank to satisfy an indebtedness to the Bank brought about by the overdrafts of its cashier and the Land Company. Exemption from liability will not be granted to the Bank under such circumstances. Knobley Mountain, etc., Co. v. People's Bank (1925) 99 W. Va. 438, 129 S. E. 474, 476, 48 A. L. R. 459; Holden v. New York, etc., Bank (1878) 72 N. Y. 286.

In the case of Knobley Mountain, etc., Co. v. Peoples' Bank, supra, the cashier of the bank, Leps, was also the treasurer of the plaintiff corporation with the authority to draw checks in the plaintiff's name. He drew checks and placed them to the credit of his own and his brother's account, which were at the time heavily overdrawn. In reversing the decision of the lower court, the court held that the bank could not disclaim knowledge of the fact that these sums paid on overdrafts did not belong to the debtors, and stated: "Cases may arise in which the knowledge of its sole executive should not be impressed upon the corporation, but the plain facts in this case forbid the bank such immunity. The accounts of Leps and his brother had become heavily overdrawn. These overdrafts constituted debts due the bank. Admitting as true the contention of the bank that the bank paid the checks in question, and then plaintiff's treasurer stole from the plaintiff the money obtained therewith—these facts do not exculpate the bank. In settlement of the overdrafts, the bank's cashier accepted this so-called stolen money which he knew was not the money of Leps or his brother, but which he knew was money embezzled from the Orchard Company. It was to the interest of the bank to have these overdrafts adjusted; but the bank may not close its eyes to the fact that these payments were made with money which the debtors had no right to use and its cashier no right to receive. In attempting to avail itself of the acts of its cashier to its advantage, the bank becomes subject to those to its disadvantage. ·* * *"

In Solway State Bank v. School District (1930) 179 Minn. 423, 229 N. W. 568, the court said:

"* · * * A corporation is chargeable with knowledge of facts known to its officers transacting its business. There is an exception to this rule when the particular officer representing the bank is himself adversely interested. The exception is without application, however, where the interested officer is the sole representative of the corporation in the transaction. In such case his knowledge is the knowledge of the corporation. * * ·*

"As indicated in the previous opinion herein, Smith was the only bank official who gave any attention to the affairs of the bank. We need not discuss the evidence in detail. It is sufficient to say that Smith mixed defendant's funds which were in his hands in trust, he being its treasurer, with his own, by depositing the same in his personal account. He thereafter checked out thousands of dollars and turned the same over to the bank to pay his debts to the bank. In turn he took defendant's warrants which were carried in the bank's note pouch as assets and exhibited them to the school officers as vouchers for his disbursements. There were many irregular transactions wherein he was the sole representative of the bank. Under the rule stated, the bank must be held chargeable with his knowledge—he knew all.

"The court found as a fact that when the bank closed, Smith's account therein was overdrawn, and an amount therein, rightfully belonging to defendant and exceeding the sum of all the orders involved, had been knowingly misappropriated by Smith and the bank to the payment of his checks and other

items so drawn for his individual purposes. The finding is that the bank had full knowledge, that it acquiesced, connived, and participated in the misappropriation and got the money. Such finding, which is supported by the evidence, spells liability."

If I am correct in determining that on February 4, 1922, when the defendant accepted trust funds for its own purpose, that the Bank in law became aware of the diversion of trust funds and the breach of trust, it necessarily follows that thereafter the Bank is subject to the well-recognized principle of law that: "* * * All persons knowingly participating in, or aiding in, committing a breach of trust, or in the misapplication of trust funds, are equally liable with the trustee to make good the fund by returning it to the trust estate." 26 R. C. L. 1322, Trusts, § 183.

There are many decisions in both state and federal courts that sustain the views expressed herein. U. S. Fidelity, etc., Co. v. U. S. National Bank (1916) 80 Or. 361, 157 P. 155, L. R. A. 1916E, 610; Fidelity & Deposit Co. of Maryland v. Farmers' Bank (C. C. A.) 44 F.(2d) 11, 16; Bischoff v. Yorkville Bank, 218 N. Y. 106, 112 N. E. 759, L. R. A. 1916F, 1059; Lowndes v. City National Bank (1909) 82 Conn. 8, 72 A. 150, 22 L. R. A. (N. S.) 408; Miami County Bank v. State (1916) 61 Ind. App. 360, 112 N. E. 40; United States Fidelity, etc., Co. v. People's Bank (1913) 127 Tenn. 720, 157 S. W. 414, 415; Blanton v. First National Bank (1918) 136 Ark. 441, 206 S. W. 745; Brovan v. Kyle (1917) 166 Wis. 347, 165 N. W. 382; United States Fidelity, etc., Co. v. Adoue & Lobit (1911) 104 Tex. 379, 137 S. W. 648, 138 S. W. 383, 37 L. R. A. (N. S.) 409, Ann. Cas. 1914B, 667, and note; Harris & Co. v. Chipman (C. C. A. 8, 1907) 156 F. 929; Oklahoma State Bank v. Galion, etc., Co. (C. C. A. 8, 1925) 4 F.(2d) 337; Farmers' Loan & Trust Co. v. Fidelity Trust Co. (C. C. A. 9, 1898) 86 F. 541; Havana Central R. Co. v. Central Trust Co. (C. C. A. 2, 1913) 204 F. 546, 547, L. R. A. 1915B, 715.

In Allen v. Puritan Trust Co., supra, it is stated: "The principle governing the defendant's liability is that a banker who knows that a fund on deposit with him is a trust fund cannot appropriate that fund for his private benefit, or where charged with notice of the conversion join in assisting others to appropriate it for their private benefit, without being liable to refund the money if the appropriation is a breach of the trust."

In U. S. Fidelity, etc., Co. v. People's Bank, supra, the court said: "* * * We do not wish to be understood as holding that a bank is in general liable for the acts of trustees who deposit money with them. If the money is deposited to the trustee's credit as such, and his checks are drawn on this fund in his character of trustee, or guardian, as the case may be, the bank need look no further. It is not responsible for his administration of the fund, unless it knows, or in some special transaction has good reason to believe, that he is misappropriating the fund. It would be out of all reason to impose such responsibility on banks. The special case we have before us, and to which we confine this opinion, is one wherein the bank knowingly united with the guardian or trustee in a misappropriation of the fund, by crediting it to the individual account of such trustee or guardian."

In the case of Fidelity & Deposit Co. of Maryland v. Farmers' Bank, supra, the court speaking through Judge Booth, approved the language used in the Bischoff v. Yorkville Bank, supra. The Bischoff Case concerned the peculations of one Poggenburg. He was an executor of an estate and deposited the funds of the estate to his individual account by checks drawn upon another bank. The checks that were deposited were signed by him in the name of the estate. Later on he paid from such deposits, which consisted wholly of trust funds, a personal indebtedness to the bank of deposit. The bank was held liable not only for the sum so paid but also for subsequent withdrawals. The statement in the Bischoff Case which was approved in the Fidelity & Deposit Co. of Maryland v. Farmers' Bank, supra, reads as follows:

"A bank does not become privy to a misappropriation by merely paying or honoring the checks of a depositor drawn upon his individual account in which there are, in the knowledge of the bank, credits created by deposits of trust funds. The law does not require the bank, under such facts, to assume the hazard of correctly reading in each check the purpose of the drawer, or, being ignorant of the purpose, to dishonor the check. The presumption is, and after the deposits are made remains until annulled by adequate notice or knowledge, that the depositor would preserve or lawfully apply the trust funds. The contract, arising by implication of law, from a general deposit of moneys in a bank is, that the bank will, whenever required, pay the moneys in such sums and to such persons

.as the depositor shall direct and designate. Although the depositor is drawing checks which the bank may surmise or suspect are for his personal benefit, it is bound to presume, in the absence of adequate notice to the contrary, that they are properly and lawfully drawn. Adequate notice may come from circumstances which reasonably support the sole inference that a misappropriation is intended, as well as directly. * * *

"In the present case Poggenburg paid to the defendant, as his creditor, on June 3, 1908, the sum of $765 from his account with the defendant. The finding of the trial court, supported by the evidence, is that the account at that time was constituted wholly from the trust funds. At that time and through the transaction the defendant knew that Poggenburg had appropriated $765 of those funds for his private benefit. The presumption that he would not thus violate his duty and lawful right—that he would apply the moneys to their proper purposes under the will then ceased to exist. There was absolute proof in the possession of the defendant to the contrary. The defendant had no longer the right to assume that in paying the checks of Poggenburg it was paying the executor's moneys to the executor and not to Poggenburg, the individual, or that Poggenburg would use the moneys lawfully. It had knowledge of such facts as would reasonably cause it to think and believe that Poggenburg was using the moneys of the executor for his individual advantage and purposes. Those facts indicated that the payment to it was not an isolated incident; they indicated, rather, that it was within a method or system. Having such knowledge, it was under the duty to make reasonable inquiry and endeavor to prevent a diversion. Having such knowledge, it was charged by the law to take the reasonable steps or action essential to keep it from paying to Poggenburg as his own the moneys which were not his and were the executor's, and was bound by the information which it could have obtained if an inquiry on its part had been pushed until the truth had been ascertained."

■ The charge of $418 made upon the trust account by the deposit of the unpaid Land Company's checks is concededly a liability of the Bank. U. S. Fidelity, etc., v. U. S. National Bank, supra; Lowndes v. City National Bank, supra.

In Cory, etc., Corp. v. Old (C. C. A. Va. 1928) 23 F.(2d) 803, 810, the court said: "Of course, a bank has no right to charge one man's check to the account of another without the permission of the other; and it is clear that a bank should not charge the personal checks of an agent to the account of his principal without authorization of the principal."

■ Plaintiff is entitled to interest on the various amounts misappropriated from the date of their diversion. Oklahoma State Bank v. Galion, etc., Co., supra; White v. Knox (1884) 111 U. S. 784, 4 S. Ct. 686, 28 L. Ed. 603; People's National Bank v. Payne (C. C. A. 8, 1928) 26 F.(2d) 208.

■ Some contention was made at the trial that plaintiff's action should be dismissed because he had never filed a claim with the receiver. There is no merit in this position. A presentation of a claim to a national bank receiver is not prerequisite to a suit thereon. Plaintiff as a judgment creditor will participate with the other general creditors in any dividends declared by the insolvent bank. Schulenberg v. Norton (C. C. A.) 49 F.(2d) 578.

The facts of the case before the court might justify a finding that the Bank is liable to plaintiff not only for the withdrawals from plaintiff's account on and after February 4, 1922, but in addition for the first diversion of trust funds on May 10, 1921. Ericson was the sole executive officer connected with the transaction from its inception. There are authorities that apparently recognize a liability of a bank under such circumstances. However, it is the court's opinion that the better rule to follow in the case at bar is to hold the Bank to strict accountability beginning February 4, 1922, when it accepted through its agent trust funds for illegal purposes. It was to the interest of the Bank that the overdrafts be paid; naturally the Bank intrusted to its managing agent the collection of all indebtedness due the Bank, and it cannot be successfully maintained that Ericson was acting in any personal capacity or as a guardian when he saw to it that debts due the Bank were taken care of.

Let this memorandum be made a part of the foregoing findings of fact and conclusions of law.