**154**

ESTATE of Levi T. SCOFIELD, Douglas F. Schofield, Trustee, Mary Jane Scofield Demmon (nee Mary Jane Scofield), Roy C. Demmon and Mary Scofield Demmon, Josephine Schofield Thompson, Edward W. Thompson and Josephine S. Thompson, Douglas F. Schofield Trust, Douglas F. Schofield, Trustee, Douglas F. Schofield and Mary D. Schofield, Schofield Building Land Trust, Douglas F. Schofield, Trustee, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

COMMISSIONER OF INTERNAL REVENUE, Petitioner,

v.

ESTATE of Levi T. SCOFIELD, Douglas F. Schofield, Trustee, Respondent.

Nos. 13095–13103.

United States Court of Appeals
Sixth Circuit.

April 3, 1959.

**156**

Robert F. Lee, Cleveland, Ohio, Jamison, Ulrich, Hope, Johnson & Burt and Philip J. Wolf of Hahn, Loeser, Keough, Freedheim & Dean, Cleveland, Ohio, on the brief, for Estate of Levi T. Scofield, et al., appellants and cross-appellee.

Helen A. Buckley, Washington, D. C., Charles K. Rice, Lee A. Jackson and Harry Baum, Dept. of Justice, Washington, D. C., on the brief, for Com'r of Internal Revenue, respondent.

Before McALLISTER, Circuit Judge, and MATHES, District Judge.

McALLISTER, Circuit Judge.

Petitioners in these cases, consolidated on appeal from decisions of the Tax Court, are, with one exception, trustees and beneficiaries of trusts, who severally complain of the disallowance to a testamentary trust of loss deductions to which they claim to be entitled under Section 23(e) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 23(e) refusal of the Tax Court to allow certain trustee's fees as "back pay" within the meaning of Section 107(d) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 107(d); and the taxation by the Commissioner of Internal Revenue of a certain land trust as an association, at corporate rates, rather than taxing it as a trust. The Commissioner of Internal Revenue appeals from the decision that a certain notice of deficiency was invalid and, therefore, deprived the Tax Court of jurisdiction in that case.

The controversy, as colorful as it is complicated, can best be understood by a brief statement of the facts, which largely concern four generations of the Scofield family, of Cleveland, Ohio, commencing at the turn of the century.

In 1901, Levi T. Scofield built the Schofield Building, at that time, a large office building, in the City of Cleveland, Ohio. He died on February 25, 1917. He was survived by a daughter, Harriet Scofield Bushnell; two sons, William M. Scofield and Sherman W. Scofield; and two grandchildren, Douglas F. Schofield and Josephine Schofield Thompson, who were the children of his deceased son, Douglas, who died in 1912. The widow of Douglas married her brother-in-law, the above mentioned William M. Scofield, in 1916, and of that marriage, a daughter, Mary Jane Scofield Demmon, was born after the death of Levi T. Scofield.

When Levi T. Scofield died in 1917, he left a will by which he established a testamentary trust. The corpus of the trust was the Schofield Building. The beneficiaries of the trust were his two sons, his daughter, and his two grandchildren. The will provided that the son, William M. Scofield, was to be trustee of the trust; that each of the three surviving children of the grantor, Levi T. Scofield, was to be a one-fourth beneficiary of the trust income; and that each of his two grandchildren, as well as the widow of Douglas, was to be a one-twelfth beneficiary of the trust income. The corpus of the trust was to vest in the beneficiaries on September 14, 1942, when Josephine S. Thompson, his youngest grandchild at the time of the grantor's death, attained the age of thirty years.

The will of Levi T. Scofield was duly admitted to probate, and his son, William, was appointed executor, thereafter filing his final account, as such, on March 8, 1918, at which time the account was allowed and the executor discharged. William did not file his application for appointment as trustee of the testamentary trust until March 15, 1926, when the Probate Court of Cuyahoga County entered the order appointing him trustee of such trust, to serve without bond; and he served, in fact, as such trustee, from the death of Levi T. Scofield in 1917 until April 22, 1935, when his resignation as testamentary trustee was filed and accepted by the court. William's brother, Sherman, had acted as manager of the Schofield Building from a time prior to the death of his father, Levi T. Scofield, and he continued to act in that capacity

until 1932. The real operating manager of the building, however, from May 1, 1928, to September 12, 1935, was Carlton Schultz, Inc., which had been so appointed upon the insistence of the mortgagee of the building, The Northwestern Mutual Life Insurance Company.

In 1934, Levi T. Scofield's only grandson, Douglas F. Schofield, graduated from law school and was admitted to practice at the Ohio bar. At that time, The Northwestern Mutual Life Insurance Company was demanding approval of a new, and larger, mortgage on the Schofield Building. This demand for a new mortgage led Douglas, who had just been admitted to the bar, to read, for the first time, the will of his grandfather, Levi T. Scofield, and to inquire about the trust. The investigation led to his discovery, in the early part of 1935, that large amounts of the trust funds had been used by his uncles, William, the trustee, and Sherman, the manager of the building, for their own purposes. He also discovered that, although The Northwestern Mutual Life Insurance Company had a mortgage of $504,000.00 on the building at the time of the death of his grandfather, nevertheless, his uncle, William, had given additional mortgages on the building in excess of $100,000.00, which were completely unauthorized. Douglas, upon ascertaining these facts, refused to consent to the execution of the new mortgage which was demanded by Northwestern Company in the amount of approximately $800,000.-00, which was to replace the former mortgages and to secure additional funds for the installation of new elevators. Upon the refusal of Douglas to consent to the new mortgage, Northwestern brought suit to foreclose its mortgages. William thereupon resigned as trustee, and the young lawyer, Douglas, was appointed successor trustee. After four weeks of trial of the foreclosure proceedings, a settlement was made, by which Northwestern was obliged to reduce its claim by $105,000.00, at the same time receiving a new mortgage, approved by the Probate Court, dated January 1,

1937. Douglas, as successor trustee, then obtained full control of the management of the Schofield Building.

In his investigation with regard to the misuse of the assets of the trust, Douglas discovered that during the period from 1917 to 1932, a total of $453,-939.10 of testamentary trust funds had been disbursed by his uncles, William and Sherman, for non-trust purposes, mostly for their personal use in the way of investments for themselves, advancing of grubstakes in gold mining ventures, payment of personal bills, and gifts to certain relatives. In addition to contesting Northwestern's foreclosure proceedings and reducing its claim by $105,000.-00, Douglas filed actions against his uncles William and Sherman, seeking recovery from them for upwards of two million dollars for breaches of trust, diversions of trust funds, and interest wrongfully paid on the unauthorized mortgages. At that time, William and Sherman had no assets of any importance other than their contingent interests in the corpus of the trust, which would vest in them if they should live until September 14, 1942.

In 1940, Douglas secured judgments against William in the amount of $2,-541,939.31, and against Sherman in the amount of $2,464,928.70. He further sued, on December 5, 1935, The Cleveland Trust Company, seeking recovery of $1,069,306.08 on the ground that it had participated with William and Sherman in breaches of the testamentary trust. In this case, the trial court rendered a judgment in favor of the trustee against the bank in the principal amount of $10,-000.00. Com.Pl., 9 Ohio Supp. 159. On appeal to the Supreme Court of Ohio, the trustee there received, in 1948, an additional judgment against the bank in the amount of $31,606.11, which, together with interest and costs, aggregated $90,-326.76. Schofield v. Cleveland Trust Co., 1948, 149 Ohio St. 133, 78 N.E.2d 167.

After the above decision in the Supreme Court of Ohio, the trustee proceeded against sixty-two defendants whom he had sued in 1936 for the aggre-

gate sum of $48,128.84; and in 1948, he received $5,465.99 on fifty-eight of those claims. Two of the remaining claims were settled in 1949 for $1,750.00; one was settled in 1953 for $500.00; and the last claim was abandoned in 1953.

William M. Scofield, the first trustee, died on July 3, 1942, approximately two months before his interest in the corpus of the trust would have vested in him; and Sherman Scofield died on August 4, 1942, approximately one month before his interest in the corpus of the trust would have vested in him. The interests of William and Sherman in the corpus of the trust would have aggregated one-half of the value of the Schofield Building; and if they had lived until September 14, 1942, this interest could have been appropriated by their nephew, Douglas, as trustee, in satisfaction of the large judgments he had previously obtained against them for breach of trust and diversions of trust assets; and the interests of William and Sherman that could have been thus appropriated would have approximated the principal amounts of the diversions of trust property of which they had been guilty. The deaths of the two uncles within two months of the date their interests in the corpus of the trust would have vested in them, thus deprived the trustee of securing their shares for the trust, in an amount of many hundreds of thousands of dollars.

As trustee of the estate of Levi T. Scofield, Douglas F. Schofield filed the income tax return for the testamentary trust for the taxable year, January 1, 1948, to December 31, 1948, claiming a loss in the amount of $949,968.17 because of the diversion of the trust funds which occurred prior to 1935, and reported a net operating loss for the year of $919,807.87.

In 1949, the trustee of the testamentary trust filed claims for refund of income taxes paid by the trust in 1946 and 1947, based on a carry-back of the loss sustained in 1948 and the two previous years.

The Commissioner of Internal Revenue, in a deficiency notice dated October 9, 1951, determined deficiencies against the testamentary trust for 1946 and 1947, and for the period, January 1, 1948, to June 30, 1948. The deficiencies so determined were based on the disallowance of the $949,968.17 loss claimed in 1948, and were also based on the ground that a certain recovery against The Cleveland Trust Company constituted additional income during such period.

The trustee petitioned the Tax Court for a redetermination of the deficiencies, claiming that the amount of the trust's net operating loss, sustained in 1948, was $414,917.35. The trustee based this claim upon the fact that, although he had discovered the losses incurred by diversions through breach of trust in 1935, there were reasonable grounds for his belief that he had good prospects of recovering all of the diversions by litigation which he commenced in 1935 and prosecuted continuously until 1948. Under these circumstances, the trustee contends that he was entitled to claim the loss, as a 1948 deduction, under Section 23(e) of the Internal Revenue Code of 1939, which provides, as follows:

" § 23. *Deductions from gross income.* * * *

"(e) *Losses by individuals.* In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise—

"(1) if incurred in trade or business; or

\* \* \* \* \* \*

"(3) of property not connected with the trade or business, if the loss arises from fires, storms, shipwreck, or other casualty, or from theft."

The applicable regulations are Regulations 111, Section 39.23(e)–1, which, in part, provide as follows:

"In general losses for which an amount may be deducted from gross income must be evidence by closed and completed transactions, fixed by

identifiable events, bona fide and actually sustained during the taxable period for which allowed. Substance and not mere form will govern in determining deductible losses. Full consideration must be given to any salvage value and to any insurance or other compensation received in determining the amount of losses actually sustained."

The Tax Court held that when the trustee discovered the losses incurred through the breach of trust of his uncles, the possibility of any recovery was too remote to render the extent of the diversion loss incapable of valuation and, accordingly, too remote to permit its postponement until the conclusion of the litigation; that the trustee deducted the loss only after the last possible hope of recoupment expired; and that any reasonable taxpayer would have claimed such a loss long before.

■■ It is to be said that the government contended, with respect to the foregoing, that embezzlements are generally deductible in the year in which they occurred, rather than the year of discovery, and that, therefore, the embezzlements having occurred prior to the appointment of the successor trustee, could not have been availed of by him, after his appointment. The Tax Court, however, properly pointed out that "The year in which a taxpayer may claim a loss as the result of embezzlement depends upon when the loss was, in fact, sustained. This is a factual question which must be decided on the basis of all the relevant circumstances. Treasury Regulations 111, Sec. 29.43–2 provides that an embezzlement loss is to be taken ordinarily in the year when the embezzlement occurred. 'Ordinarily' does not mean always; and, hence, in some instances, embezzlement losses are deductible in the year in which the taxpayer discovers the embezzlement. Alison v. United States, 344 U.S. 167 [73 S.Ct. 191, 97 L.Ed. 186] (1952)."

■ The issue as to the right of the trustee to claim the loss as a deduction in 1948 depends upon whether, in 1935, when the trustee commenced his actions, there was a reasonable prospect of recovery of the assets of the trust wrongfully diverted, or whether such a prospect was only nebulous and problematical; and whether it was unreasonable for the successor-trustee not to have claimed the loss before the litigation was concluded. Callan v. Westover, D.C.S.D. Cal.1953, 116 F.Supp. 191, affirmed sub nom. Riddell v. Callan, 9 Cir., 1956, 235 F.2d 190; cf.: Brown v. Commissioner, 6 Cir., 1938, 94 F.2d 101, 103; Gowen v. Commissioner, 6 Cir., 1933, 65 F.2d 923, 924; see also: Commissioner v. Harwick, 5 Cir., 1950, 184 F.2d 835; cf.: Rose Licht v. Commissioner, 1938, 37 B.T.A. 1096; Allied Furriers Corp. v. Commissioner, 1931, 24 B.T.A. 457; and see Burnet v. Huff, 1933, 288 U.S. 156, 53 S.Ct. 330, 77 L.Ed. 670; Lewellyn v. Electric Reduction Co., 1927, 275 U.S. 243, 247, 48 S.Ct. 63, 72 L.Ed. 262; Contra: Hinrichs v. Helvering, 1938, 68 App.D.C. 206, 95 F.2d 117; Commissioner v. Highway Trailer Co., 7 Cir., 1934, 72 F.2d 913; American Code Co., Inc. v. Commissioner, 2 Cir., 1929, 30 F.2d 222; Peterson Linotyping Co. v. Commissioner, 1928, 10 B.T.A. 542.

■ Normally where a taxpayer is in good faith willing to go to the trouble and expense of instituting suit to recoup a 23(e) type loss, there is as a matter of fact sufficient chance of at least part recovery to justify that taxpayer in deferring the claim of a loss deduction under Section 23(e) until the litigation in question is concluded. This is not to suggest that in some cases the facts and circumstances will not show such litigation to be specious, speculative, or wholly without merit and that the taxpayer hence was not reasonable in waiting to claim the loss as a deduction. However, in the absence of such circumstances, a taxpayer who feels that chance of recovery is sufficiently probable to warrant bringing a suit and prosecuting it with reasonable diligence to a conclusion is normally reasonable in waiting until the termination thereof to claim a Section 23(e) deduction.

The Supreme Court has many times dictated that losses under Section 23(e) are to be allowed or disallowed in accord with practical or realistic considerations. See: Alison v. United States, 1952, 344 U.S. 167, 73 S.Ct. 191, 97 L.Ed. 186; United States v. S. S. White Dental Manufacturing Co., 1927, 274 U.S. 398; Boehm v. Commissioner, 1945, 326 U.S. 287, 66 S.Ct. 120, 90 L.Ed. 78; and Lucas v. American Code Co., 1930, 47 S.Ct. 598, 71 L.Ed. 1120, 280 U.S. 445, 50 S.Ct. 202, 74 L.Ed. 538. The Sixth Circuit has expressly adopted this view. See Glenn v. Louisville Trust Co., 6 Cir., 1942, 124 F.2d 418. It would appear to be in accord with such dictates to give at least prima facie weight to the good faith determination of a taxpayer that recovery of a given loss is worth pursuing by litigation.

■ We are of the opinion that the trustee had reasonable grounds for his belief that he had good prospects for the recovery of the diversion of assets of the trust when he commenced his actions in 1935, and that, accordingly, he was entitled to claim the losses as a deduction in 1948, when these legal proceedings were finally concluded and when the losses were, at that time, evidenced by closed and completed transactions. Callan v. Westover, D.C.S.D.Cal.1953, 116 F.Supp. 191, affirmed *sub nom.* Riddell v. Callan, 9 Cir., 1956, 235 F.2d 190; and see Glenn v. Louisville Trust Co., 6 Cir., 1942, 124 F.2d 418.

The reasons for our conclusions are as follows:

(1) When the trustee sued William and Sherman in 1935, they had practically no assets; but the judgments which the trustee was awarded against them in 1935 would be a lien on the one-half interest in the entire corpus of the estate which William and Sherman would inherit if they were living on September 14, 1942, when their interests would absolutely vest in them. There would have been a reasonable expectation, in our opinion, on the part of any trustee, in similar circumstances, that the trust would have made a recovery of diverted funds by William and Sherman, up to the time of their deaths, one and two months, respectively, before their interests in the trust corpus would have vested in them—which would be seven years after the trustee had filed his actions against them; and, as heretofore pointed out, the successor-trustee was entitled to claim such a loss deduction in 1948, when the suit which he had prosecuted with reasonable diligence had terminated in a successful conclusion.

(2) In 1935, the trustee began a suit against The Cleveland Trust Company, hereinafter also called the "Bank," where all the funds of the testamentary trust had been always deposited. This suit by the successor trustee was to recover the trust funds, which the Bank, with notice or knowledge of their character, received from the first trustee, William, and the manager of the Schofield Building, Sherman, in payment of their personal obligations to the Bank. The suit was also brought to recover a large amount of trust funds diverted by the trustee, William, and by the manager, Sherman, by way of checks given to third persons on the trust account in payment of their personal expenses and for their personal purposes. The Bank paid out funds of the trust, on these checks, although from its own repeated transactions with the trustee and with the manager, it knew that they were regularly breaching the trust by issuing checks to the Bank in payment of their personal expenses.

Before bringing suit against the Bank, the successor trustee had made a study of the applicable law and had further consulted with two distinguished members of the Ohio bar. As a result, the successor trustee and his legal counsel came to the conclusion that the prospects of recovery from the bank, in the amount of the checks drawn on the trust account in payment of the personal debts of William and Sherman *to the Bank*, were practically certain. Moreover, the successor trustee and his legal counsel further concluded that the Bank was also liable for diversions of funds of the trust which were paid *to third parties* on

checks drawn upon the trust account in payment of the debts of William and Sherman.

On the first aspect of the claim against the Bank—that of the receipt by the Bank of trust funds in payment of the personal debts of William and Sherman to the Bank—the trial court, which was the Court of Common Pleas of Cuyahoga County, held that the Bank was liable to the testamentary trust in the amount which it had received, through checks drawn by William and Sherman, in their fiduciary capacity, on the Schofield Building account, to pay personal debts owed by them to the Bank. The Court of Common Pleas awarded the trustee a judgment in the amount of $10,000.00 against the Bank for these diversions. On appeal, the Supreme Court of Ohio, differing merely on the question of the application of the statute of limitations, increased the judgment from $10,000.00 to $41,606.11. The Ohio Supreme Court's decision was in accord with the almost unanimous weight of authority [3 Scott on Trusts, Section 324.4 (2d Ed.1956); 4 Bogert Trusts and Trustees, Section 907 (2d Ed.1948); and see Grace v. Corn Exchange Bank Trust Co., 1943, 287 N.Y. 94, 38 N.E.2d 449, 145 A.L.R. 436 and cases there cited.]

On the second aspect of the claim against the Bank—that it was liable for the payment of checks to third persons drawn on the testamentary trust in satisfaction of the personal expenses and purposes of William and Sherman—the trial court held that the Bank was not liable.

On the issue of liability on the part of the Bank for the payment of checks drawn on the trust and payable to third persons in satisfaction of the above mentioned personal expenses, the successor trustee relied upon the authority of Bischoff v. Yorkville Bank, 218 N.Y. 106, 112 N.E. 759, 761, L.R.A.1916F, 1059, which held that where a bank learned that one, in a fiduciary capacity, was drawing from a trust fund account to pay personal debts, such notice of di-

versions placed the bank upon inquiry, and charged it with notice of all diversions of trust funds from the account subsequent to the first diversion.

In the Bischoff case, the court said:

"[The Bank] had knowledge of such facts as would reasonably cause it to think and believe that Poggenburg was using the moneys of the executor for his individual advantage and purposes. Those facts indicated that the payment to it was not an isolated incident; they indicated, rather, that it was within a method or system. Having such knowledge, it was under the duty to make reasonable inquiry and endeavor to prevent a diversion. Having such knowledge, it was charged by the law to take the reasonable steps or action essential to keep it from paying to Poggenburg as his own the moneys which were not his and were the executor's, and was bound by the information which it could have obtained if an inquiry on its part had been pushed until the truth had been ascertained. It did nothing of that sort, and by supinely paying, under the facts here, as found, the subsequent checks of Poggenburg, it became privy to the misapplications."

The doctrine of the Bischoff case was reaffirmed in Gilliland v. Lincoln-Alliance Bank & Trust Co., 239 App.Div. 68, 264 N.Y.S. 779, affirmed in 264 N.Y. 517, 191 N.E. 543 (1934), and again in 1941 in Grace v. Corn Exchange Bank Trust Co., 287 N.Y. 94, 38 N.E.2d 449, 145 A.L.R. 436, wherein the court stated:

"Experience has failed to show that a bank is subjected to an undue burden by the ruling that it may not ignore clear indications that a debtor is paying a personal indebtedness out of funds which do not belong to him." 287 N.Y. at page 107, 38 N.E.2d at page 454.

In Grace v. Corn Exchange Bank Trust Co., supra, checks tendered and accepted, to pay a trustee's over-draft and note loans to the Corn Exchange Bank,

and also payments on a loan which the bank made to a corporation of which the trustee was co-owner and treasurer, were drawn on a testamentary trust account at that bank. It was held that the Corn Exchange Bank was liable to the successor trustee for all diversions accomplished through checks on the trust account subsequent to the first check received by the bank to pay personal indebtedness of the trustee to the bank. Speaking for the court, Judge Lehman stated the rule of liability as follows:

"By ignoring these facts and their necessary implications, the bank became a guilty participant in the trustee's embezzlement of trust funds deposited in the trust account in the bank and from that date it became liable as a joint wrongdoer for all moneys which the trustee embezzled." 287 N.Y. at page 107, 38 N.E.2d at page 454.

"Where a bank accepts payment of any indebtedness with knowledge that the debtor is wrongfully using moneys which do not belong to him, the bank becomes a participant in the debtor's wrongful act, and what the court said and decided in Bischoff v. Yorkville Bank, supra, leads to the inevitable conclusion that elemental principles of honesty and good faith are violated * * *. If the bank chooses to ignore completely the facts which indicate that the debtor is using moneys which may not belong to him, and accepts payment careless whether or not the moneys paid belong to him, it becomes morally and legally a participant in the debtor's wrong." 287 N.Y. at page 105, 38 N.E.2d at page 453.

The trial court (the Court of Common Pleas), in the instant case, in considering Bischoff v. Yorkville Bank, supra, stated that, under the rule in that case, The Cleveland Trust Company would be liable "for practically all of the diversions of the trustee." The court further noted that there was a line of authority which followed the Bischoff case, but that

"The Ohio courts have not spoken on this phase of the law." The court then proceeded to hold that, unless The Cleveland Trust Company had actual notice that the checks issued by William and Sherman on the trust account, and payable to third persons, were diversions for their personal expenses and purposes, the Bank would not be liable for such diversion, and that notice on the part of the Bank of prior diversions to the Bank itself, by William and Sherman, did not place any burden of inquiry upon the Bank as to whether the subsequent checks issued by William and Sherman in their fiduciary capacity and payable to third persons were diversions constituting a breach of trust.

This 1942 decision of the Court of Common Pleas was affirmed in 1948 in an opinion of the Supreme Court of Ohio, 149 Ohio St. 133, 78 N.E.2d 167, 169, in which the Bischoff case was not mentioned, and in which it was said that the court would not disturb the trial court's finding that the Bank "did not have any actual knowledge of the use of (such) funds for non trust purposes."

It is fair to conclude, as did the Court of Common Pleas, that, if the Bischoff case, which was the leading case on the subject, were followed in Ohio, The Cleveland Trust Company would have been liable to the trust estate "for practically all of the diversions of the trustee." At the time when the successor trustee filed his suit against the Bank, the Ohio courts had not spoken on this issue. There was, however, substantial precedent in jurisdictions other than New York in support of the Bischoff rule here in question, as well as respectable support among acknowledged authorities. See 4 Bogert, Trusts and Trustees, Section 910 (1935). See also Martin v. First National Bank of Rush City, D.C. Minn., 51 F.2d 840; Fidelity & Deposit Co. of Maryland v. Farmers' Bank, 8 Cir., 44 F.2d 11; Peoples National Bank v. Guier, 284 Ky. 702, 145 S.W.2d 1042; Jones v. United States Fidelity & Guaranty Co., 165 Va. 349, 182 S.E. 560; Fidelity & Deposit Co. v. Oklahoma State

Bank, 10 Cir., 77 F.2d 734; McIntosh v. Detroit Savings Bank, 247 Mich. 10, 225 N.W. 628; Hartford Accident & Indemnity Co. v. Farmers National Bank, 24 Tenn.App. 699, 149 S.W.2d 473. Admittedly, substantial authority existed which had rejected the Bischoff rule. See Scott, Participation in a Breach of Trust, 34 Harv.L.Rev. 454, 477–482 (1921); 3 Scott on Trusts, Section 324.4 (2d Ed.1956). Thus, although the successor-trustee taxpayer could not proceed with perfect confidence, he had every reason to feel that chances of recovery were substantial.

In the light of the foregoing, and of the fact that able and reputable legal counsel had advised the successor trustee that, in their opinion, the Bank would be liable for all the diversions that went to third parties, we are of the view that the trustee acted reasonably in bringing his action against the Bank, with substantial prospects of recovering the diversions, and that, accordingly, he was entitled to claim, as deductions in 1948, those losses resulting therefrom which he was not able to recover.

(3) Each of the sixty-two Probate Court complaints filed by the successor trustee was against a payee of a check, drawn by the trust fiduciaries on the Schofield Building account at the Bank, and received by the payee in payment of personal debts owed them by the trust fiduciaries. These proceedings, which were commenced in 1936, had been held in abeyance until the decision of the Supreme Court of Ohio in The Cleveland Trust Company case in 1948, because recovery of the same diversions was also sought from the Bank; and these complaints in Probate Court were settled upon the conclusion of the Bank case, which was the decisive legal precedent for liability. The settlement of these complaints in 1948 was in the aggregate amount of $5,465.99.

The total recoveries by the successor trustee from all litigation during 1935–1948 was $49,021.84. In accordance with what has been said, at no time between 1935 and before 1948 was there a year when a reasonable taxpayer, exercising ordinary business care and prudence, would have considered the prospects of recoupment of the diversions to have been hopeless, and have dropped such claims for recoupment. The successor trustee could not, in the exercise of prudence, have treated, prior to 1948, the diversions as closed and completed transactions, fixed by identifiable events, so as to be able to claim a loss deduction. The trustee was, therefore, entitled to the deductions claimed as a loss in 1948 in the amount of $414,917.35—the difference between the diversions and the recovery by the trustee.

■ The Tax Court, in its opinion, applied substantially the same test or criteria for determination of year of loss as is here applied; but our reversal, on this issue, stems from different factual conclusions and from different inferences drawn from the facts. In determining the reasonableness or unreasonableness of a taxpayer's delay in claiming a 23(e) loss deduction, the situation should be viewed as of the time the determination was originally made by the taxpayer, and not as of the time of the tax litigation many years afterward. The only fair test is foresight, not hindsight. Callan v. Westover, D.C.S.D.Cal.1953, 116 F.Supp. 191, 199, affirmed Riddell v. Callan, 9 Cir., 1956, 235 F.2d 190, and cases therein cited. In its conclusions as to the reasonableness of the taxpayer's delay in claiming the loss deduction in this case, it is our view that the Tax Court relied on hindsight and, on this record, its factual conclusions and its inferences drawn f...m the facts in cases Nos. 13,095/13,100, inclusive, are clearly erroneous. 26 U.S.C.A., § 7482(a); United States v. United States Gypsum Co., 333 U.S. 364, 394, 395, 68 S.Ct. 525, 92 L.Ed. 746; cf. Boehm v. Commissioner, 326 U.S. 287, 293, 66 S.Ct. 120, 90 L.Ed. 78.

In case No. 13,101, the trustee next claims to be entitled to the benefits of the "back pay" provisions of Section 107(d) of the Internal Revenue Code of 1939, with respect to compensation paid

to him in 1946, 1947, and 1948, for services rendered as trustee during the period 1934 through 1947. This claim was denied by the Tax Court. The trustee's contention is based upon the ground that when the new court-approved mortgage was placed on the Schofield Building in 1937, an agreement was made between the trustee and the mortgagee that, in order to avoid receivership, the amount of fees to be paid to the trustee would be restricted to a certain percentage of the rents collected, regardless of the amount allowed as reasonable trustee fees by the Probate Court. Thereafter, in 1946, this restriction was lifted, at which time a large amount of unpaid trustee's fees that had been approved by the Probate Court had accumulated. Subsequently, the trustee paid himself the back fees for former years and allocated them to the earlier years. The trust had, in every year, during 1934–1948, sufficient funds with which to pay the yearly compensation, as allowed by the Probate Court—and the only reason that it had not been paid was that such payment was restricted by the aforesaid agreement between the trustee and the mortgagee.

The ground upon which the Tax Court denied the trustee's claim that he could properly allocate the unpaid fees to the prior years was that the compensation received by the trustee from the trust was not compensation received by an employee from an employer, and that, accordingly, under the provisions of Section 107(d) of the Internal Revenue Code of 1939, it could not be so allocated.

In order to qualify as "back pay" under the statute, the compensation is required to be "remuneration, including wages, salaries, retirement pay, and other similar compensation, which is received or accrued during the taxable year by an employee for services performed * * * for his employer * *."

A trustee is not an employee of a trust. No authority is advanced to the contrary. He is not an agent of the trust. It is the authority to enter into contracts which shall bind another that is the distinguishing characteristic of agency. The occasion to distinguish between the relations of agency and trust may arise in many ways. The question most commonly arising is whether the person who may be either cestui que trust or principal is liable upon contracts made by the person claimed to be agent or trustee. If the person acting be agent, the other, whether disclosed or not, may be liable as principal; if the person acting be a trustee merely, he may bind himself by his contracts, but he cannot make the cestui que trust personally responsible. Mechem on Agency, Sections 42 and 43 (1914). In the contract in this case between the beneficiaries and the trustee, it is explicitly provided that the trustee shall have no power to bind the beneficiaries personally, and that, in any written contract made by the trustee, reference shall be made to the instrument of trust, and those contracting with the trustee shall look only to the funds and property of the trust for payment.

█ While the legislative history shows a Congressional intent to alleviate a seeming injustice and to make Section 107(d) broadly applicable, there is nothing therein which shows just how broad the intended scope of the section was to be. The fact that the word, "employee," is used in Section 107(d), while the word, "individual," is used in Section 107(a), indicates that a limit was to be set somewhere short of including all noncorporate taxpayers. Just where the limit was to be set, however, is nowhere conclusively or even helpfully indicated. Moreover, the term, "employee," is not a word of art in the law of trusts. In construing Section 107(d) and defining the term, "employer," we are of necessity, then, thrown back upon the normally or commonly accepted meaning of the word with the dictionary as perhaps prima facie evidence of that meaning. Old Colony Railroad Co. v. Commissioner of Internal Revenue, 1932, 284 U.S. 552, 560, 52 S.Ct. 211, 76 L.Ed. 484.

█ In spite of the learned and forceful argument advanced on this phase of

the case on behalf of the trustee, it is our conclusion that the language of the statute is clear and controlling; that the "back pay" provisions, applicable to an employee, do not apply to the trustee; and that the trustee, therefore, is not entitled to their benefits.

Another question is presented by these appeals in case No. 13,102: whether a land trust formed by the beneficiaries of the testamentary trust was taxable as an association. The parties having the beneficial interests in the testamentary trust created by Levi T. Scofield in 1917 decided, after their interests had vested in 1942, to form a trust for the holding and managing of the office building that had formed the corpus of the prior testamentary trust. Interest in the new trust was evidenced by transferable certificates; the trustee had wide powers and was exempted from the ordinary laws governing fiduciaries; the liability of the beneficiaries was limited to the trust property; and the beneficiaries had the power to remove and appoint trustees and to modify or terminate the trust.

Whether the land trust in question is taxable as a corporation depends on the application of the provisions of the Internal Revenue Code of 1939, and the Treasury Regulations promulgated thereunder.

Section 3797(a)(3) of the Code, 26 U.S.C.A. § 3797(a)(3) defines a corporation as including "associations." In Morrissey v. Commissioner, 296 U.S. 344, 356, 357, 56 S.Ct. 289, 295, 80 L.Ed. 263, the Supreme Court said:

" 'Association' implies associates. It implies the entering into a joint enterprise, and, as the applicable regulation imports, an enterprise for the transaction of business. This is not the characteristic of an ordinary trust—whether created by will, deed, or declaration—by which particular property is conveyed to a trustee or is to be held by the settlor, on specified trusts, for the benefit of named or described persons. Such beneficiaries do not ordinarily, and as mere *cestuis que trustent*, plan a common effort or enter into a combination for the conduct of a business enterprise. * * * In what are called 'business trusts' the object is not to hold and conserve particular property, with incidental powers, as in the traditional type of trusts, but to provide a medium for the conduct of a business and sharing its gains." [1]

Where a real estate trust was established by members of the family upon real estate used for office and business purposes, which they owned as tenants in common, and which was primarily a family affair, in which the beneficial interests were represented by certificates which were transferable, and the trustee had full and complete powers of management, without, however, any power to create liabilities against the certificate holders, who had the power of in-

---

1. Treasury Regulations 111, Section 39.-3797-3, provide as follows:

"Sec. 39.3797-3. *Association Distinguished From Trust.*—The term 'trust,' as used in the Internal Revenue Code, refers to an ordinary trust, namely, one created by will or by declaration of the trustees or the grantor, the trustees of which take title to the property for the purpose of protecting or conserving it as customarily required under the ordinary rules applied in chancery and probate courts. * * *

"As distinguished from the ordinary trust described in the preceding paragraph there is an arrangement whereby the legal title to the property is conveyed to trustees (or a trustee) who, under a declaration or agreement of trust, hold and manage the property with a view to income or profit for the beneficiaries. Such an arrangement is designed (whether expressly or otherwise) to afford a medium whereby an income or profit-seeking activity may be carried on through a substitute for an organization such as a voluntary association or a joint-stock company or a corporation, thus obtaining the advantages of those forms of organization without their disadvantages."

creasing the number of trustees, removing the trustee and appointing a new trustee, as well as to modify the declaration of trust, to terminate the trust, or to give the trustee instructions thereunder, it was held that such a trust constituted engaging in the conduct of business, and that it was an association taxable as a corporation under the statute. Hecht v. Malley, 265 U.S. 144, 44 S.Ct. 462, 68 L.Ed. 949.

Petitioners contend that, under the Morrissey case, supra, the Hecht case is no longer controlling authority for the reason that Morrissey holds that, in business trusts, "the object is not to hold and conserve particular property, with incidental powers, as in the traditional type of trusts." It is argued that, in the instant case, the object was to hold, and conserve particular property—the office building—with incidental powers—of managing it; and that, accordingly, the trust in this case is not a business trust, which may be taxed at corporate rates, but merely a traditional trust, not subject to such taxation.

It would seem, from its object, and the powers of the trustee, that the Schofield Land Trust is something other than a "traditional type" of trust to hold and conserve particular property, with the incidental power of management. It has, rather, the aspects of a trust, which has the object, in the language of the Morrissey case, "to provide a medium for the conduct of a business and sharing its gains," with many of the attributes of a corporation. In a traditional type of trust, the beneficiaries do not ordinarily, as they did in this case, plan a common effort or enter into a combination for the conduct of a business enterprise.

The line of separation between trusts and associations is often so vague as to make them almost indistinguishable. Cleveland Trust Co. v. Commissioner, 6 Cir., 115 F.2d 481, 483. Each case must be adjudicated on its own facts. Petitioners insist, under the authority of Morrissey v. Commissioner, 296 U.S. 344, 56 S.Ct. 289, 80 L.Ed. 263, that the distinction made between trusts taxable as trusts, and trusts taxable as corporations, depends upon whether the objective is to hold and conserve particular property, with incidental powers, as in the traditional type of trusts, or to provide a medium for the conduct of a business and sharing gains, as in a business trust.[2] In the Morrissey case, the court was concerned with a fixed investment trust which was, in its nature, a passive trust. In the instant case, the land trust was an income-producing enterprise. It was carrying on an extensive business of managing a large office building, leasing at profitable rentals as many as 250 offices, and several street floor stores. The trustee was obliged to hire and supervise as many as forty-five full-time employees, including elevator operators, a cleaning force, maintenance men, painters, engineers, and clerical help; and the trust was being operated for profit. In such a case, as was said in Main-Hammond Land Trust v. Commissioner, 6 Cir., 200 F.2d 308, 311: "The circumstance that only one piece of property was involved is immaterial."

The extent of the powers vested in the trustee may be the factor that distinguishes whether the relationship is that of a trust or an association. Sherman v. Commissioner, 6 Cir., 146 F.2d 219. Where the property involved is operated for profit, and the trust which holds it is carrying on a business, the trust is taxable as an association; if the trust merely receives and distributes the proceeds of an investment, it is not taxable as an association. See Commissioner v. Fortney Oil Co., 6 Cir., 125 F.2d 995.

We are of the view that the decision of the Tax Court holding that the

---

**2.** "But the nature and purpose of the co-operative undertaking will differentiate it from an ordinary trust. In what are called 'business trusts' the object is not to hold and conserve particular property, with incidental powers, as in the traditional type of trusts, but to provide a medium for the conduct of a business and sharing its gains." 296 U.S. at page 357, 56 S.Ct. at page 295.

land trust here involved was taxable as an "association," or corporation, should be affirmed. Cooper v. Commissioner, 10 Cir., 262 F.2d 530, certiorari denied 79 S.Ct. 724.

■ It appears that the testamentary trust was on a calendar-year basis from 1917 through 1948, and filed its tax return on that basis. The statutory notice of deficiency incorrectly stated that the period Jan. 1, 1948, to June 30, 1948, was the period covered, whereas the adjustments and computations of tax liability contained in the notice were based upon the entire calendar year of 1948. The trust's petition for redetermination before the Tax Court placed in issue the entire year of 1948, and the parties, in their stipulation of facts before the Tax Court, agreed that: "The adjustments and computations of tax liability contained in said notice of deficiency are based upon receipts and disbursements of said testamentary trust for the entire calendar year of 1948." Thus, while the deficiency notice, in form, covered a six months' period, in substance, it covered the correct period of the entire year. Under these circumstances, the notice was not invalid and did not deprive the Tax Court of jurisdiction in case No. 13,103; and its decision to the contrary should be set aside and remanded for further proceedings on this aspect of the case, if our determination of other issues does not result in the removal of this question from the case. Commissioner v. Forest Glen Creamery Co., 7 Cir., 98 F.2d 968. The same conclusion applies to the deficiency notice asserted by the Commissioner in case No. 13,102 against the land trust heretofore mentioned.

Numerous questions were presented by petitioners to the Tax Court but were not reached by that tribunal, since its disposition of other issues rendered their consideration unnecessary. The conclusions set forth in the above discussion will make evident to counsel which of the questions remain for consideration by the Tax Court on remand, and which are eliminated by virtue of our determination herein.

In accordance with the foregoing, the decisions of the Tax Court in cases Nos. 13,101 and 13,102 are affirmed; and the decisions in cases Nos. 13,095 to 13,100, inclusive, and in case No. 13,103, are reversed and remanded for further proceedings not inconsistent with this opinion.

This case was argued to a panel of the court consisting of McALLISTER and STEWART, Circuit Judges, and MATHES, District Judge. Judge STEWART became an Associate Justice of the Supreme Court of the United States before a decision was reached or this opinion was prepared. He, therefore, did not participate in the decision, opinion, or judgment in this case.