T.C. Memo. 1998-338

UNITED STATES TAX COURT

ESTATE OF ROBERT L. WAGNER, DECEASED, RUTH R. WAGNER, PERSONAL
REPRESENTATIVE, AND RUTH R. WAGNER, ET AL.,[1] PETITIONERS <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos.  8581-96, 25799-96,     Filed September 23, 1998.
25800-96, 25801-96.

RTA, an S corporation within the meaning of sec.
1361(a), I.R.C., reported a loss to its shareholders on
account of a failed investment in certain technology.
The shareholders deducted their pro rata shares of that
loss on their returns.  Respondent disallowed those
deductions on the ground that the loss was not
evidenced by a closed and completed transaction in the
year the loss was claimed on account of the reasonable
prospect of a recovery under a lawsuit against the
supplier of the technology.
<u>Held</u>:  Respondent's determination is sustained
because petitioners have failed to prove that RTA's
chances for success on the lawsuit were remote or

---

[1]    Cases of the following petitioners are consolidated
herewith:  Walter W. Manley II, docket No. 25799-96; Richard T.
Wagner and Margie S. Wagner, docket No. 25800-96; Charles E.
Lecroy II and Karen A. Lecroy, docket No. 25801-96.

nebulous or, if not remote or nebulous, the financial condition of the defendant made unrealistic the possibility of an actual recovery.

Stephen G. Salley and Anthony J. Scaletta, for petitioners.

William R. McCants, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HALPERN, Judge:  These cases have been consolidated for trial, briefing, and opinion.  By separate notices of deficiency, respondent determined deficiencies in Federal income taxes as follows:

| | | Docket No. | | |
|---|---|---|---|---|
| Year | [1]8581-96 | 25799-96 | 25800-96 | 25801-96 |
| 1991 | -- | $88,523 | $236,376 | $12,491 |
| 1990 | $2,199 | -- | -- | -- |
| 1989 | 16,758 | -- | -- | -- |
| 1988 | 36,716 | -- | -- | -- |

[1]  Respondent made adjustments for 1991, which decreased petitioners' net operating loss for 1991 and, consequently, petitioners' loss carrybacks to 1988, 1989, and 1990, which created deficiencies in tax for those earlier years.

Except as otherwise noted, all section references are to the Internal Revenue Code in effect for the years in issue.  All Rule references are to the Tax Court Rules of Practice and Procedure.

The common denominator in these consolidated cases is Resource Technology Associates, Inc. (RTA), a small business corporation within the meaning of section 1361(b).  Petitioners Ruth R. Wagner, Richard T. Wagner, Walter W. Manley II, and Charles Lecroy were shareholders in RTA during 1991 (the

shareholders). RTA reported a loss to the shareholders for 1991, and, on account thereof, each claimed a loss deduction in determining his or her 1991 Federal income tax liability. Respondent disallowed those loss deductions, and the sole issue remaining for decision is whether RTA sustained the loss that gave rise to the shareholders' claimed deductions.

FINDINGS OF FACT

Introduction

Some of the facts have been stipulated and are so found. The stipulation of facts, with accompanying exhibits, is incorporated herein by this reference. At the time of the filing of the petitions in these cases, all petitioners resided in Florida.

Resource Technology Associates, Inc. (RTA)

RTA, a Florida corporation, was organized on July 26, 1989. RTA was organized for the purpose of investing in a new and speculative technology for the safe and efficient disposal of used truck and automobile tires. Shortly after it was organized, RTA elected pursuant to section 1362(a) to be an S corporation within the meaning of section 1361(a). RTA's taxable year is the calender year.

Environmental Disposal Systems, Inc., and the Tire Transformation System

Prior to organizing RTA, the shareholders had researched and investigated an opportunity for investing in a product that would

dispose of old tires. That product, the tire transformation system (TTS), was being marketed and promoted by Environmental Disposal Systems, Inc. (EDS), a Georgia corporation. The TTS was designed both to transform used truck and automobile tires into marketable byproducts, such as oil, steel, ash, and carbon black, and to comply with the environmental requirements of the Federal Clean Air Act. EDS, which held patent rights to the design of the TTS, had successfully obtained the necessary State regulatory permits and had instituted an experimental prototype of the TTS in Georgia in 1988.

Master Asset Acquisition Agreement

On August 29, 1989, RTA and EDS entered into an agreement, the Master Asset Acquisition Agreement (the agreement). The agreement provides for the acquisition of the TTS by RTA from EDS. The Agreement was amended in June 1990 to grant RTA nationwide developmental and marketing rights in the technology underlying the TTS (the marketing rights).

The Agreement provides that EDS will deliver the TTS to RTA "on a completely installed, 'turn key' basis for the sum of $2,500,000.00" (the purchase price). The agreement further provides that the purchase price is to be paid in installments, upon completion of specified construction benchmarks. Because EDS possessed neither the experience nor the equipment necessary to manufacture the TTS, the agreement identifies a third-party fabricating company, Miles Fabricating & Machine Co., Inc. (Miles

Fabricating), which the parties agreed would manufacture the TTS. The agreement also requires EDS to provide RTA with all assistance and advice necessary for obtaining the regulatory permits required for operation of the TTS. EDS's principal shareholders guaranteed the performance of EDS's obligations under the agreement.

Construction and Permitting of the TTS

Subsequent to entering into the agreement, RTA began searching in Polk County, Florida, for a site on which to locate the TTS. Manufacture of the TTS began in the fall of 1989. On May 11, 1990, RTA applied for a permit from the Florida Department of Environmental Regulation (FDER). Obtaining the FDER permit was key to RTA's success, because, without it, RTA could not legally operate the TTS in Florida. On June 5, 1990, the FDER sent RTA's president, Robert L. Wagner (deceased husband of petitioner Ruth R. Wagner) a letter detailing certain deficiencies in RTA's permit application and identifying substantial additional information that RTA was required to submit before the FDER could fully consider the permit application.

The Lawsuit

In June 1990, Miles Fabricating stopped manufacturing the TTS because RTA had terminated its periodic payments to EDS and EDS lacked the financial resources necessary to pay Miles Fabricating. EDS considered RTA's cessation of payments a breach

of the agreement and, in August 1990, sent RTA a notice of default, asserting that the agreement was canceled. RTA reciprocated by sending EDS its own notice of default, asserting that (1) EDS had failed to provide the technical reports and information concerning the TTS that were necessary to obtain the FDER permit and (2) RTA intended to hold EDS and its officers responsible for this and other alleged breaches of the agreement. At that time, RTA had paid in excess of $1.6 million towards the development of the TTS, the TTS was approximately 55 percent complete, and the underlying TTS technology remained unproven.

Initial attempts at salvaging the business relationship between RTA and EDS failed, and, in September 1990, RTA filed a complaint (the complaint) in a lawsuit (the lawsuit) against EDS and its principal shareholders in the Circuit Court of the Ninth Judicial Circuit, in and for Orange County, Florida (the Circuit Court). The complaint contains three counts. The first count relates to the TTS and alleges breach of contract. Among the remedies sought are (1) specific performance of the agreement by EDS, (2) delivery of the TTS, (3) damages, and (4) injunctive relief against EDS selling or using the TTS. Alternatively, the complaint asks for a return of moneys paid to EDS and damages. The second count relates to the marketing rights; it alleges breach of contact and asks for injunctive relief. The third count relates to certain medical technology, alleges breach of contract, and asks for injunctive relief. EDS answered the

complaint, mostly denying the allegations, and counterclaimed. The counterclaim alleges that RTA breached the agreement and asks for damages.

## The Injunction

In December 1990, in pursuit of the lawsuit, RTA petitioned the Circuit Court for an injunction preventing EDS from selling the TTS equipment to other investors. RTA successfully persuaded the Circuit Court of the merits of its claim for an injunction, but it did not post the required bond, and the Circuit Court did not issue the injunction.

## Permit Denial

On March 19, 1991, the FDER issued RTA a notice of permit denial, formally denying approval of RTA's application to operate the TTS in Polk County, Florida. The FDER denied the permit because, among other things, RTA had failed to provide much of the technical information requested by the FDER. RTA did not pursue its rights under Florida law to appeal the denial.

## The FDER Invitation

Although it had denied RTA's permit application, on April 17, 1991, the FDER invited RTA to participate in oral discussions with the FDER and five other firms concerning innovative technologies for the disposal of waste tires. Participants selected by the FDER would receive State contracts for the disposal of waste tires. RTA prepared an information package on the TTS and made an oral presentation to the FDER.

Despite its efforts, the FDER did not award RTA a waste tire disposal contract.

Cessation of RTA's Business Operations

Following RTA's failure to obtain a FDER waste tire disposal contract, the shareholders collectively determined that RTA would cease all further business activities.  In May 1991, RTA discharged its employees and ceased operations.  RTA did not further pursue obtaining a FDER permit, attracting additional investors, or marketing or promoting the TTS technology.

EDS's Agreement with Tire Recyclers, Inc.

At the time RTA discontinued payments to EDS in mid-1990, EDS began marketing the TTS and underlying technology to new investors.  On November 6, 1991, EDS entered into an agreement to sell the equipment to an unrelated company, Asset Holding Co., which assigned its rights to Tire Recyclers, Inc. (the TRI agreement and TRI, respectively).  Pursuant to the TRI agreement, TRI agreed to purchase the TTS (i.e., the partially constructed TTS that EDS originally had been constructing for RTA) for a purchase price of $3 million plus costs incurred in transporting the TTS to TRI's business location in Virginia.  One-fourth of the purchase price ($750,000) was payable to EDS prior to shipment of the TTS, and the balance was due to EDS once the TTS had been successfully constructed and, among other things, had satisfied all governmental requirements for continued operation.

RTA had been aware of EDS's efforts to sell the TTS as early as January 1991, when RTA sent a memorandum to Charles White, a principal shareholder of TRI, warning of its interest in the TTS.

Conclusion of the Lawsuit

The lawsuit continued until the fall of 1992, when negotiations between RTA and EDS produced a settlement agreement (the settlement agreement), which the parties executed on December 24, 1992.  The settlement agreement terminated the lawsuit and provided that EDS would pay RTA $2.1 million (the settlement amount).  Payment of approximately one-half of the settlement amount was dependant upon successful completion of the TRI agreement.  The remainder of the settlement payment was dependent on EDS' making future sales of products, equipment, or intangible rights.  The parties executed an addendum to the settlement agreement in February 1993, which granted RTA an option to purchase all products or services of EDS at the lowest prices offered by EDS to other purchasers, as well as a territory in which RTA would have marketing rights for future sales of the tire transformation system technology.

Continued Development of the TTS

EDS and TRI continued to develop the TTS over the next several years (1993-95).  Nevertheless, as of the date of trial of this case, the TTS had not been placed into service, and, consequently, RTA had received no reimbursement as a result of the settlement agreement.

Tax Returns

On RTA's Federal income tax return for 1991, RTA claimed a loss of $1,692,000 with respect to its investment in the TTS (the TTS loss). RTA characterized the TTS loss as resulting from the disposition of section 1231 property and reported to each shareholder his or her (her) pro rata share of the TTS loss. Each shareholder is a calender-year taxpayer. Each reported her pro rata share of the TTS loss on her 1991 Federal income tax return. Respondent denied the shareholders' deductions for the TTS loss, explaining that there was insufficient evidence of a loss.

OPINION

I. Introduction

Resources Technology Associates, Inc. (RTA), is an S corporation within the meaning of section 1361(a). As such, it is not generally subject to Federal income tax. See sec. 1363(a). Instead, RTA's items of income, loss, deduction, and credit are passed through to its shareholders and taxed directly to them. See sec. 1366. RTA determined that it suffered a loss in 1991 on its investment in certain technology and reported that loss to its shareholders (the shareholders), each of whom claimed his or her (her) pro rata share on her 1991 Federal income tax return. Respondent does not question RTA's investment in the technology; respondent questions only whether RTA sustained any loss in 1991 because RTA had pending at the end of 1991 a lawsuit

that respondent believes afforded RTA a reasonable prospect for recovering its investment.  The sole issue we must decide is whether RTA failed to sustain a loss in 1991 because the lawsuit afforded RTA a reasonable prospect of recovery.  That presents a question of fact, and petitioners bear the burden of proof.  Rule 142(a).  Petitioners have failed to carry that burden.

## II.  Summary of Facts

In 1989, RTA and Environmental Disposal Systems, Inc. (EDS), entered into an agreement (the agreement) for the acquisition by RTA from EDS of the tire transformation system (TTS). Difficulties ensued, and, in September 1990, RTA sued EDS for breach of contract (the lawsuit), its principal requests being specific performance, delivery of the TTS, and injunctive relief. In May 1991, RTA discharged its employees and ceased business operations.  It claimed a loss on its 1991 Federal income tax return on account of abandonment of the TTS (the TTS loss) and reported the TTS loss to the shareholders.  The lawsuit was concluded in 1992, when EDS agreed to pay RTA $2.1 million, none of which, however, has been paid.

## III.  Law Applicable to Deductions of Losses

### A.  Allowance for Losses Sustained During the Taxable Year

With limitations not here pertinent, section 165 "[allows] as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise."  Sec. 165(a). Section 1.165-1(b), Income Tax Regs., provides:  "To be allowable

as a deduction under section 165(a), a loss must be evidenced by closed and completed transactions, fixed by identifiable events, and * * * actually sustained during the taxable year."   An essential inquiry under the "closed transaction" concept is whether, in the year the deduction is sought, there exists a substantial possibility that the alleged losses could be recouped by actions against responsible third parties or otherwise.  E.g., Ramsay Scarlett & Co. v. Commissioner, 61 T.C. 795, 807 (1974), affd. 521 F.2d 786 (4th Cir. 1975).  When such a claim exists, no portion of the loss with respect to which reimbursement might be received is sustained until it becomes reasonably certain that reimbursement will not be received.  Sec. 1.165-1(d)(2)(i), Income Tax Regs.

B.   Reasonable Prospect of Recovery

The existence of a reasonable prospect of recovering from litigation is determined by the facts and circumstances of each case.  Boehm v. Commissioner, 326 U.S. 287, 292-293 (1945).  The determination is based primarily on objective evidence, Ramsay Scarlett & Co. v. Commissioner, supra at 812, but the taxpayer's subjective belief as of the close of the taxable year also is a relevant factor, Boehm v. Commissioner, supra at 292-293.  The loss deduction need not be postponed if the potential for success of a claim is remote or nebulous.  Ramsay Scarlett & Co. v. Commissioner, supra at 811.  Also, where the financial condition of the person against whom a claim is filed is such that actual

recovery cannot realistically be expected, the loss deduction need not be postponed. Gottlieb Realty Co. v. Commissioner, 28 B.T.A. 418, 420-421 (1933). Alternatively, if the taxpayer's claim is not speculative or wholly without merit, and if the taxpayer believes that the chance of recovering the loss is sufficiently probable to warrant bringing a lawsuit and prosecuting it with reasonable diligence to a conclusion, the taxpayer may have to wait until the conclusion of the lawsuit to claim the loss deduction. Estate of Scofield v. Commissioner, 266 F.2d 154, 159 (6th Cir. 1959) (regarding a theft loss), affg. in part and revg. in part 25 T.C. 774 (1956).

IV. Analysis

A. Introduction

RTA, which was formed to exploit the TTS, discharged its employees and ceased business in 1991. At that time, all it had to show for its investment in the TTS were its unfulfilled contract rights under the agreement, the possibility of success under the lawsuit (which was much the same thing), and a potential liability under the counterclaim. The principal relief RTA sought in the lawsuit was not money damages but completion of the agreement, delivery of the TTS, and the protection of RTA's nationwide developmental rights. We must determine not only whether RTA's claim had some minimal chance of success but also whether such success would ring hollow because of EDS's lack of resources.

B.  <u>The Lawsuit</u>

We have examined the agreement and the complaint, and, on their faces, the agreement is valid and the complaint properly drawn.  J.P. Carolan III, is an attorney who represented RTA in the lawsuit.  At trial, he opined that EDS would not be successful in terminating the agreement in its entirety and that RTA "had a claim".  He described RTA's initial efforts to prosecute the lawsuit, including RTA's success on the merits in December 1990 in asking for an injunction to prevent EDS from selling the TTS equipment to other investors.  He stated that, even after RTA failed to post the bond necessary to have the injunction issued, RTA's activity on the lawsuit (primarily discovery) continued for a few months, until the lawsuit became dormant for economic reasons in early 1991.  Walter W. Manley II, one of the shareholders, a director of RTA, an attorney, and a professor of business administration at Florida State University, College of Business, testified credibly that there was merit to the breach of contract claim that gave rise to the lawsuit.  Messrs. Carolan's and Manley's testimony convinces us that the breach of contract claim in the lawsuit had merit.  The second count of the lawsuit related to the marketing rights obtained by RTA from EDS.  We presume that, in some part, the injunctive relief that RTA successfully argued for related to that count, and that success convinces us that the marketing rights claim of the lawsuit had merit.  Petitioners have presented no evidence

that EDS would have been successful in its defenses to the lawsuit or with respect to the counterclaim. We are, thus, satisfied that the lawsuit had merit--that RTA's chance of success in the lawsuit was not remote or nebulous--and we so find.

C. Realistic Possibility of Enforcing a Judgment

Having found that the lawsuit had merit, we now inquire whether there was a realistic possibility that RTA could actually have enforced a judgment against EDS. The principal remedies sought by RTA were specific performance, delivery of the TTS, and injunctive relief. Alternatively, RTA asked for the return of moneys paid by RTA and unspecified damages. Petitioners' principal argument is that EDS had no financial ability to provide either performance under the agreement or any money to RTA. Petitioners point to EDS's dire financial condition as objective evidence that performance or payment was not reasonably foreseeable at the end of RTA's 1991 tax year. Petitioners overlook two things, however. First, EDS's principal shareholders were named in the complaint and had guaranteed the performance of EDS's obligations under the agreement. Petitioners have failed to prove the inability of those principal shareholders to satisfy any judgment against them. Second, EDS had patent and other rights with respect to the TTS technology, along with certain TTS equipment. RTA has failed to prove those rights and equipment were valueless. Indeed, during 1991 the

shareholders were aware that EDS was seeking new investors for the TTS.  In the counterclaim, EDS alleges that, on or about January 16, 1991, RTA interfered with an advantageous business relationship between EDS and one Charles White.  A memorandum attached to the counterclaim from "Bob Wagner, Resources Technology Associates, Inc." to "Mr. Charles White" mentions the lawsuit and claims an interest in, among other things, the TTS equipment.  On November 6, 1991, EDS entered into a contract to sell the TTS equipment for $3 million ($750,000 before delivery) to a company of which Mr. White was the controlling shareholder (Asset Holding Co., which assigned its rights to Tire Recyclers Inc.).  Petitioners have failed to prove that, as of the end of 1991, there was no realistic possibility of an actual recovery from EDS or its guarantors.

D.  Subjective Belief

We have taken into account the testimony of the two shareholders who testified:  Walter W. Manley II, and Richard T. Wagner.  It is clear that, at some point, both of those shareholders lost confidence in the TTS investment.  Mr. Manley testified about his refusal in late 1990 or early 1991 to post the necessary $50,000 bond following the successful effort to persuade a court to issue an injunction:  "Because at that particular time, I was the person providing the money, and I had determined considerably before then that it was a worthless project, and * * * I wasn't about to put good money after bad

money."  Apparently, Mr. Manley had become disenchanted with the project even before it began, when the fabricator of the TTS equipment, Miles Fabricating & Machine Co., Inc., would not become "a participant" in the agreement between RTA and EDS. Mr. Manley testified that he proceeded with his investment because he had given his word that he would do so to his close friends Richard T. Wagner and Robert L. Wagner (husband of shareholder Ruth R. Wagner).  Richard T. Wagner testified that the decision not to post the $50,000 bond was not recommended by all those with an interest in the matter.  He testified that, although he did not agree, his father, Robert L. Wagner, was hopeful that the TTS technology could be proven or that EDS could be successful at some point.  Mr. Manley testified: "[Robert L. Wagner] had a different risk profile then I did."

Apparently, the shareholders had different beliefs on the probable success of RTA's investment in the TTS.  However, Mr. Manley, the man with the money, was in control.  He decided not "to put good money after bad money".  That was a business judgment, which was different not only from the business judgment of Robert L. Wagner, but also from the business judgment of Charles White, who, in 1991, agreed to pay $3 million for a TTS, $750,000 to be paid before delivery.

We have considered the testimony of Messrs. Manley and Richard T. Wagner, and we conclude that it does not establish that there was no reasonable prospect for recovery on the lawsuit

at the end of 1991 but only that they did not wish to bear the risk associated with any further investment.

E.  Conclusion

Petitioners have failed to prove that RTA's claim against EDS and its shareholders was speculative or wholly without merit. RTA instigated a lawsuit, which, at least initially, it prosecuted diligently and, in any event, eventually settled on favorable terms.  We believe that the evidence does not establish a closed and completed transaction with respect to the TTS investment in 1991 because there was a reasonable prospect of recovery on the lawsuit at the end of 1991.  Accordingly, no loss deduction is allowable to RTA for 1991.

V.  Conclusion

We have concluded that RTA did not suffer a deductible loss with respect to the TTS during 1991.  Therefore, no deductible loss may be passed through to the shareholders in that year. Respondent's determinations of deficiencies in the shareholders' Federal income tax liabilities are sustained.

Decisions will be entered

for respondent.